# CHARLESTON.

## STATE v. CLARK.

Submitted January 14, 1902.    Decided April 9, 1902.

1. DWELLING HOUSE—*Trespass—Use of Deadly Weapon.*
   A bare trespass against the property of another, not his dwelling-house, is not sufficient provocation to warrant the owner in using a deadly weapon in its defense. Under certain circumstances trespass against the dwelling-house will justify it. (p. 461).

2. ASSAULT—*Murderous Intent—Deadly Weapon.*
   Where an attack is made with murderous intent and with a deadly weapon, there being a sufficient overt act, the person at-

tacked being himself without fault, is under no duty to fly or retreat; he may stand his ground and if need be kill his adversary. (p. 463).

3. DEADLY WEAPON—*Threat—Preparation.*

One who has been threatened with such an attack and has reasonable ground to believe it will be made, may arm himself for defense, and in such case no inference of malice can be drawn from the fact of preparation. But it is for the jury to determine, from all the evidence in the case, whether there was reasonable ground for such belief, and the purpose for which the deadly weapon was procured. (p. 463).

4. ASSAULT JUSTIFIABLE—*Must Retreat.*

In cases of assault, not made with the intent to kill or do great bodily harm, or when the person assaulted is not in his dwelling-house, he cannot justifiably kill his assailant without first having retreated "to the wall." (p. 464).

5. INSTRUCTIONS—*Duty of Court.*

The court is not bound to give two or more instructions on the same subject or phase of the case and substantially alike. (p. 469).

6. INSTRUCTIONS—*Immaterial Issues.*

It is not error to refuse instructions the giving of which would raise immaterial and irrelevant issues and thereby tend to mislead and confuse the jury. (p. 465).

7. VENIRE FACIAS—*Statute's Directory.*

The statutory requirements respecting the time of issuing writs of *venire facias* for petit juries and summonses to jury commissioners to draw the jurors are directory, and substantial compliance therewith is sufficient. (p. 471).

8. SEPARATION OF JURY—*Presumption—Prejudice.*

Separation or misconduct of the jury in a criminal case only raises a presumption of impurity in the verdict, and if that presumption be fully overcome and it be shown beyond reasonable doubt that the prisoner has not been prejudiced thereby, such separation or misconduct does not vitiate the verdict. (p. 472).

Error to Circuit Court, Mingo County.

Thomas Clark was convicted of murder, and brings error.

*Affirmed.*

SHEPPARD & GOODYKOONTZ, J. S. MARCUM, and J. B. WILKINSON, for plaintiff in error.

ROMEO H. FREER, Attorney General, for the State.

POFFENBARGER, JUDGE:

Thomas Clark was convicted of murder in the first degree on the 17th day of January, 1901, in the circuit court of Mingo County, and sentenced to life imprisonment, having been charged with the murder of one John Dempsey. He and Dempsey were neighbors, living on opposite sides of Pigeon creek, their houses being about one hundred and forty yards distant from each other, Dempsey owning the land on which he resided and Clark's wife owning the land on which the prisoner resided. Rather between the two houses, Old House Branch flowed into Pigeon Creek, and at that point there was a ford, at which a path leading from Dempsey's house crossed the creek and ran on the land of Clark's wife around a fence, inclosing a small lot, to a public road. This path, Dempsey had been using. He and Clark had had some differences about religious matters and about the trustees and teacher of their district school. Clark decided to prevent Dempsey from using the path and set up some posts and nailed up a board across it. On the 15th day of August, 1900, Clark and some members of his family were working in that lot near where he had put the board across the path, and Dempsey also came there. Just across the little branch Moses Parsley, who lived on the adjoining farm, was working close by and was an eye witness to the shooting, and also heard the quarrel which led up to it. He was the only witness for the state who saw the shooting, and he testified as follows: He found Dempsey and Clark at or near the place where the board had been put up. Dempsey called Parsley down to the creek to talk to him, wanting to know if he could have the privilege of passing over Parsley's land. Parsley replied that the land adjoining Mrs. Clark's belonged to his wife, and if he would see her she would give him a right of way over it. Dempsey replied that that was all right, and then turned around to Clark and said, "Tom, you run around and pretend to preach and pray and ask the Good Lord to have mercy on you. They kick better men out of Hell every day than you are. Yes, they kick better men out of Hell than you are." To this, Clark said, "That is all right, you go along and attend to your mormonism and you will have enough to do." Then Dempsey went toward his house and Clark toward his, and, in a very few minutes, Clark returned

through the corn with a shot gun, stood and held it awhile and set it down by the fence. Witness had gone back to his work in the mean time, and some friendly words passed between him and Clark. Just after that, he saw Clark whirl around, and heard him say, "John Dempsey, if you come upon me, I will shoot." Then he heard Dempsey say,, "Shoot and be God dammend, if you want to." Then he heard the report of the gun. When the gun cracked Dempsey indicated that he had been hit and the mule whirled with him and ran back. Witness went down and found Dempsey lying in the bed of the creek.

The defendant testified that he had notified Dempsey not to trespass upon his land nor use the path, and then nailed the plank up, across the path. While he was there nailing the plank, Dempsey came down into the creek and said, "I see, Tom, you are nailing me in." Witness replied, "No, I am nailing you out." Then Dempsey said, "You are the God damned meanest man I ever saw. You will go around and preach and pray and ask the good Lord to have mercy on you, and there are better men kicked out of hell every day than you are. Yes, there are better men kicked out of hell every day than you are." Clark said, "That is all right, Mr. Dempsey; that is all right. You have got enough to do to attend to your Mormonism." Dempsey replied, "God damn you I will put you out of the way." Clark asked, "What do you mean by that?" The reply was, "God damn you, I will tell you." The prisoner asked, "When?" Deceased replied, "As soon as I go to the house and get my ax." Clark finished nailing up the plank, went to the house and got his gun, came back, walked out to where the board was nailed up, set the gun down by the fence, and went to pulling weeds. Then looking across the creek, he saw Dempsey coming with a double bitted ax on his shoulder, and he said to him, "Stop there; don't you come on me with that ax." Deceased kept coming on until he got up within a few feet, and then rose in his saddle, drew his ax and said, "Shoot and be God damned." The prisoner shot, believing Dempsey intended to hit him with the ax.

Celia Davis, the only other eye witness, testified as follows: Dempsey said to Clark, "I see you are nailing me in." Clark replied, "No, I am nailing you out." Dempsey said, "You are the damned meanest man I ever saw." Clark replied, "Well,

that is all right; I don't want any trouble with you." Then Dempsey said, "Hell kicks out better men every day than you are." Clark replied, "That is all right." Then Dempsey said, "I will put you and your plank both out of the way. Damn you, I will kill you." Then they both turned, each going to his own house. After Clark had brought his gun, Dempsey rode up and Clark said, "Stop there; don't you come upon me or my possessions or I will shoot." Dempsey rode on and Clark told him the third time to stop, and Dempsey said, "Shoot and be God damned," rose in his saddle and drew his ax, and then Clark fired.

The court gave the jury ten instructions at the request of the State. In the brief, objection is made to No. 2, No. 5, No. 7 and No. 9. No. 2 is the usual instruction on the duty of the slayer to retreat as far as he safely can before killing his assailant, when the killing grows out of a quarrel and combat between the parties, both being in fault. While there was no evidence of any combat, yet, if the deceased was only committing a trespass against the property of the prisoner, and the killing resulted from that, the trespass would not justify the killing of the trespasser and it was the duty of the prisoner to yield. He could not stand and take life in defense of his property against a mere trespass. While the application of the instruction to the case is somewhat doubtful, it could not have prejudiced the prisoner and if there was error in giving it it was harmless.

No. 5 instructed the jury that, if they believed from the evidence that Dempsey was about to commit a trespass against the property of the prisoner or that of his wife, and the prisoner, in attempting to prevent the commission of the trespass, gave the deceased a mortal wound, they should find him guilty of murder. The objection to this is, that it failed to inform the jury that the trespass, although insufficient to justify the killing, was proper to be considered as provocation which might reduce the offense to manslaughter. It was not necessary to base the theory of manslaughter upon the trespass. Nor would it have been proper to have based it upon that alone. "A bare trespass against the property of another, not his dwelling-house, is not sufficient provocation to warrant the owner in using a deadly weapon in its defense, and if he do, and with it kill the trespasser, it will be murder, and this, though killing

were actually necessary to prevent the trespass." Whar. on Hom., s. 414. This is in the chapter entitled "Provocation and Hot Blood." It may be proper for the jury to consider the trespass as one of a number of circumstances operating to produce passion and heat of blood which may have resulted in the killing, but the theory of manslaughter must depend upon something more than that a trespass had been committed or attempted. The instruction announcing the law of manslaughter would have been proper in the case, and would, no doubt have been given, had it been asked. The reason for not asking it may be that instruction No. 10 informed the jury that it was within their province to find the prisoner not guilty of murder but guilty of voluntary manslaughter. The exception to this instruction is, therefore, not well taken.

Instruction No. 7 is objected to. It is simply an instruction to the effect that if the prisoner relies upon self defense to excuse him, the burden of showing such excuse is upon him and he must prove such defense by a preponderance of the evidence, and that the jury should consider all the evidence introduced on behalf of the State and the prisoner in ascertaining whether there is such preponderance. It is said, this does not harmonize with the fifth point of the syllabus in *Manns' case,* 48 W. Va. 480. Undoubtedly, all the evidence both for the State and for the prisoner would include all the evidence and circumstances in the case. There is nothing in the objection.

No. 9 instructed the jury that, if they should find the defendant guilty as charged in the indictment, they should find whether he was guilty of murder in the first degree or second degree, and then went on to say that, if they found him guilty of murder in the first degree, they might recommend imprisonment, and then gave the punishment for murder in each of the degrees. The complaint against this instruction is, that the jury may have inferred that they could not find the defendant guilty of any offense lower than murder of the second degree. There is nothing in this for the very sufficient reason that instruction No. 10, immediately following it, told the jury it was within their province to find the prisoner guilty of voluntary manslaughter. It amounts to the same thing as if it had all been put in one instruction, and the jury could not possibly have been mislead by it.

All the other instructions for the State are clearly good and

no reason is assigned in the brief why any of them should not have been given. It is useless to take up time and space in repeating them.

The defendant requested the court to give twenty-seven instructions and fourteen of them were given. The propriety of the action of the court in refusing some of these instructions will be better understood after referring to the law applicable to the various phases of the case. As has been shown, a bare trespass to real estate will not justify the killing of the trespasser. It was for the jury to determine whether the deceased, after going away and returning with a double-bitted ax, had come with the intention of making a murderous assault upon the prisoner, or simply with the intention of breaking down the fence with the ax. The latter would have been a mere trespass, and although a quarrel might have grown out of it, and the deceased, in the course thereof, might have made an assault upon the prisoner, without having come there with a preconceived intent and design of taking the life of the prisoner. Under such circumstances, the prisoner could not have stood his ground and killed his assailant and have been wholly justified in doing so. But had the jury found that the deceased had expressed to the prisoner an intention of killing him before leaving to obtain the ax, and returned with it for that purpose and was approaching the prisoner with the intent to kill him, and it was necessary for the prisoner to kill the deceased in order to prevent the commission of such felony, then he did have the right to stand, and was not bound to fly, or retreat, and also had the right to prepare for his defense by obtaining the gun. Under such circumstances, neither the possession of the gun at the time and place in question nor the prisoner's having gone after it and brought it there, would have afforded ground for the inference that he premeditated the killing of deceased. "Where an attack is made with murderous intent, there being a sufficient overt act, the person attacked is under no duty to fly; he may stand his ground, and if need be kill his adversary." Bish. Cr. Law, s. 850. "It is familiar doctrine that one assaulted with murderous intent may avert the felonious result by taking the aggressor's life. The law of self-defense justifies him, but his justification rests equally in the fact that he is resisting the commission of a felony." Bish. Cr. Law, ss. 849, 866. See also Whar. on Hom.,

s. 533; *Mann's Case,* 48 W. Va. 480. So far as point 1 of the syllabus in *Zeigler's Case,* 40 W. Va. 593, is in conflict with these principles, it is overruled.

"In a case of simple assault, not made with the intent to kill or do other great bodily harm, where the person assailed is not deceived as to its character so as to be within the rules regarding mistake of fact,—in other words, where the intent of the assailant is not to commit a felony, but a misdemeanor this right of perfect defense does not exist. The assailed person is not permitted to stand and kill his adversary if there is a way of escape open to him; while yet he may repel force by force, and within limits differing with the facts of cases, give back blow for blow. The rule, to which the exceptions are not numerous, appears pretty distinctly to be that the law does not justify one in killing another simply to prevent his committing a misdemeanor. These cases of mere assault, and cases of mutual quarrel, where the attacking party has not the purpose of murder in his heart, are those to which is applied the doctrine of the books that one cannot justify the killing of another, though apparently in self-defense, unless he retreated 'to the wall' or other interposing obstacle before resorting to this extreme right." Bish. Cr. Law, s. 850. The only exception to this is where a man is assaulted without intent to kill in his own dwelling house. There, he need not run or retreat, but he cannot kill his adversary unless it is necessary to save his own life, or prevent other felony. Bish. Cr. Law, s. 858. *Beard* v. *U. S.,* 158 U. S. 550.

"A man may defend his property by any force made necessary by the circumstances, such as assault and battery, short of taking the aggressor's life. But rather than slay him, he must yield and find his protection in the courts." Bish. Cr. Law, s. 875.

In view of these principles, it is manifest that the court did not err in refusing to give defendant's instruction No. 17. It reads as follows: "The court instructs the jury that a person has the right to repel force by force in the defense of his person or his property, and in so doing if he use only such force as the necessity or apparent necessity of the case requires, he is not guilty of any offense, though he kill his assailant in so doing." He cannot justifiably kill a man merely in the defense of his property.

Instruction No. 19, as requested, was to the effect that the prisoner had the lawful right to have in his possession the shot gun at the time and place mentioned by the witnesses in the case and that no presumption of malice could arise against him by reason of having the gun in his possession. From the principles above referred to, it is clear that whether such presumption would arise was dependent upon the finding of the jury as to whether it had been obtained by the prisoner under a reasonable apprehension that the deceased was about to make a murderous assault upon him. If he did not believe, or have reasonable ground to believe this, his going after the gun and having it in his possession afforded ground for the presumption of malice. The fear or probability of an attempt to commit a trespass upon his land did not justify the procurement of the gun with which to resist the trespass. Hence, the instruction was bad for the reason that, if given, it would have told the jury that no such presumption arose in either case.

Proposed instruction No. 14 was as follows: "The court instructs the jury that where one, in the defense of his person, habitation or property, kills another who manifestly intends and endeavors by violence or surprise to commit a forcible or atrocious felony upon either, such killing is justifiable homicide, and in such case the justification of the prisoner must depend upon the circumstances as they appear to him at the time of the killing." This instruction would have been misleading, as tending to inform the jury that the prisoner might have killed the deceased in defense of his property.

Proposed instruction No. 12 was to the effect that, if the prisoner armed himself with a shot gun for the purpose of defending his family, habitation or property, no presumption of malice arose from the possession of the weapon. It was bad for the reason assigned in reference to proposed instruction No. 19. Whether such presumption arose depended upon the finding of the jury as to the purpose for which, and the circumstances under which, the prisoner so armed himself. Had it been so limited, it would have been proper.

Proposed instruction No. 21 was properly refused. It was to the effect that the deceased had no lawful right to interfere with or break or tear down the fence, erected by the prisoner on land in his possession. That was a matter wholly immaterial and irrelevant to the issue.

Proposed instruction No. 15 reads as follows: "The court instructs the jury that where a homicide has been committed, and it appears from the evidence that there was an old grudge existing between the parties, but that at the time of the homicide there was a fresh and sudden provocation given by the deceased to the defendant, then the law presumes that such killing was caused by such fresh provocation and not due to the old grudge." This instruction would have taken from the jury the power to say whether the killing was malicious or in heat of blood. That question clearly belongs to the jury and the court could not invade its province. It could not exclude from the jury consideration of the old grudge in connection with the other circumstances of the case. By giving such an instruction it would have done so. It would also have taken it out of the power of the jury to say whether the killing was done in resistance of the trespass, and that would have been improper. Nothing is better settled than that every instruction must be founded upon the evidence in the case and in view of the circumstances of the case. An abstract proposition of law which may be applicable to one case may be wholly inapplicable to another by reason of the difference in the evidence and circumstances. This instruction was given in the *Mann's Case,* 48 W. Va. 480, and approved. But the circumstances of that case were far different from those of this one.

That where an old grudge is clearly proven, the law presumes that the killing occurred on it, unless the proof shows a new and sufficient provocation, and that then the law will presume that the killing was on the new provocation, has been held in *Miller* v. *State,* 3 Heisk. 376; *State* v. *Hill,* 4 Dev. Natt. (N. C.) 491; *State* v. *Baker,* 1 Jones, (N. C.) 267; *Honesly's Case,* 81 Va. 283. But in *Reed's Case,* 22 Grat. 924, it is held that it is for the jury to determine whether the shooting was induced by the previous grudge or the immediate provocation. It would seem that this view is more in harmony with the principles of our criminal law, which leave all matters of fact to the determination of the jury. And it may be doubted whether the Tennessee, North Carolina and Virginia courts, in speaking of the probability that the shooting is the result of the immediate provocation, mean anything more than that it is a presumption of fact, although they speak of it as a presumption of law. Wharton on Homicide, s. 441, speaks of it as a

presumption but does not class it as a presumption of law. Mc-Clain on Criminal Law, s. 330, after referring to the rule says it is for the jury to say whether the killing was the result of previous malice or of a subsequent provocation or necessity. Wharton on Evidence, s. 1237, says: "Presumptions of fact, in other words, relate to unique conditions, peculiar to each case, incapable of exact reproduction in other cases; and a presumption of fact applicable to one case, therefore, is inapplicable, in the same force and intensity, to any other case. But a presumption of law relates to whole categories of cases, to each one of which it is uniformly and equally applicable, in anticipation of the facts developed on trial." To regard it as a presumption of fact and to be determined by the jury harmonizes with the following, found in 2 Bish. Cr. Law, s. 673*b*: "Following the analogies of the modern law of evidence and the better procedure before juries, the judge in charging a jury should tell them that the homicide, to be murder, must be committed of what the law calls malice aforethought, which is a technical term of legal language, with a defined legal meaning. He should then explain its meaning, as viewed in connection with the facts in evidence, and explain the presumptions which may be deduced from the facts,—adding that it is for them to look at the evidence, and the reasonableness of the presumptions suggested, and decide as a question of fact whether or not the law's malice aforethought existed in the present instance." Under our practice the court does not charge the jury but, in lieu thereof, gives instructions at the request of the parties, and the instructions ought to be so given as to comply with these principles relating to the charge. Upon this as well as upon the evidence and circumstances of the case, it was proper to refuse said instruction.

Proposed instruction No. 9 reads as follows: "The Court instructs the jury that a mere preponderance of evidence or any weight of preponderant evidence is not sufficient to convict the accused, but every fact necessary to establish the guilt of the accused must be proved beyond every reasonable doubt, and if there is any reasonable hypothesis of the killing consistent with the innocence of the accused, then you must acquit the accused." This instruction is only applicable to cases in which it must be determined from circumstantial evidence whether the accused did the killing at all. *State* v. *Flannagan,* 26 W.

Va. 116. In this case it would have been misleading and wholly improper, for there was no doubt about the identity of the slayer and the only question was the intent with which the killing was done.

Instructions No. 23 and No. 27 were properly refused because Nos. 5, 7 and 16, which were given, contain the substance of Nos. 23 and 27. These five instructions are as follows:

"No. 5. The court instructs the jury that if they believe from the evidence in this case that the prisoner, Thomas Clark, being himself without fault, was attacked by the deceased, John Dempsey, in such a manner or under such circumstances as to furnish reasonable ground for apprehending a design to take away his life or to do him great bodily harm, and there was reasonable grounds for believing the danger imminent that such design would be accomplished and the said prisoner, Thomas Clark, had reasonable grounds to believe and did believe such danger imminent, then he had the right to act upon such appearances, and without retreating kill said John Dempsey, if he had reasonable grounds to believe and did believe that such killing was necessary in order to avoid the apparent danger, and the killing under such circumstances is excusable, although it may afterwards turn out that the appearances were false, and that there was in fact neither design to do him serious injury nor danger that it would be done, but of all this the jury must judge from all the evidence and circumstances in the case."

"No. 7. The court further instructs the jury that in such a case as to the imminency of the danger which confronted the prisoner and the necessity of the killing, in the first instance the prisoner was the judge, but he acted at his peril, as the jury must pass upon his action in the premises, viewing said action from the prisoner's standpoint at the time of the killing, and if the jury believe from all the facts and circumstances in the case that the prisoner had reasonable ground to believe, and did believe, the danger imminent, and that the killing was necessary to preserve his own life, or to protect him from great bodily harm, he was excusable for using a deadly weapon in his defense, otherwise he is not."

"No. 16. The court instructs the jury that the owner or occupant of property in the lawful possession of the same has

a right to use as much force as is necessary to prevent an un-lawful or forcible trespass upon the same, and if they find that the defendant was standing upon his own ground, or upon ground of which he was in lawful possession, and that in at-tempting to force a passage over the same, if they so find, the deceased, John Dempsey, was violating the law and was a trespasser, with the intent and with the means of committing a felony, and was attempting to commit a felony against the per-son or property of the prisoner, then the defendant, as owner or occupier of the land, if they so find, might repel force by force to the extent of killing the said Dempsey, if necessary so to do to prevent the commission of said felony, and such killing would be excusable."

"No. 23. The court further instructs the jury that in de-termining the question of the prisoner's right of self-defense in this case and as to whether he acted lawfully or otherwise and as to whether he was excusable or not for the use of the deadly weapon in his defense, they have the right and it is their duty to take in consideration, with all the other facts, circumstances and evidence in the case, the comparative size, age and physical condition of the prisoner and the deceased Dempsey, as well as any threats of violence, if any, made to the prisoner by the deceased at the time or immediately before the fatal shot was fired, as well as all the facts and circumstances in this case tending to show the conduct of the deceased Dempsey at and immediately before the time of the killing, together with the fact of his being armed or having in his possession a double-bitted ax at the time of such killing."

"No. 27. The court further instructs the jury that although the prisoner would not be justifiable in killing the deceased, John Dempsey, to prevent the said Dempsey from committing a bare trespass, yet you are further instructed that if you be-lieve from the evidence in this case that the prisoner believed and had good cause to believe that the deceased Dempsey was about to inflict upon him death or serious injury at the time he fired the shot that resulted in the death of the deceased, and the prisoner believed and had good cause to believe at said time that the firing of said shot was necessary to avert the threatened danger, then he was excusable for firing said shot, otherwise he was not."

Instruction No. 24 was on the subject of reasonable doubt

and it was properly refused for the reason that that subject is fully covered by instruction No. 1, which was given for the defendant, and is as follows: "The court instructs the jury that the defendant, Thomas Clark, is by law presumed to be innocent of the crime charged against him in the indictment in this cause, and that such presumption of innocence remains with him throughout every step of this trial, and that such presumption of innocence can only be removed by evidence before the jury so strong, clear and convincing in its nature as to satisfy the jury beyond all reasonable doubt of his guilt."

Proposed instruction No. 10 was as follows: "The court further instructs the jury that in determining this case they must consider, along with the other evidence, the whole of the statement in evidence before you made by the prisoner, Thomas Clark, to the witness, L. L. Hall, in reference to the killing of the deceased Dempsey, and his flight from the county and the causes thereof." This instruction would have violated the rule that it is improper to refer by an instruction to certain evidence and direct particular consideration of it or lay particular stress upon it. By admitting the evidence the court laid it before the jury for their consideration. Even if it had been proper it was not reversible error to refuse it, for the evidence was before the jury and the refusal of the instruction could not have prejudiced the prisoner.

Instruction No. 25 related to the boring of holes in the doors and walls of a school house and locking the same by Dempsey and others, as an illegal act and trespass to public property and a violation of the rights of a certain school teacher. This was improper because it related to a matter wholly irrelevant and immaterial. It could have had no purpose other than to mislead and confuse the jury by raising an immaterial issue. The same is true of proposed instruction No. 26, which relates to a lot of past transactions concerning the trustees and teacher of a certain school, a matter which had no connection whatever with the case other than that it was involved in the old differences between the accused and the deceased.

A motion to quash the indictment was made on the ground that the record did not show the impaneling of a grand jury nor the finding of an indictment. The overruling of this motion is assigned as error. Transcripts from the record show both

the impaneling of a grand jury and the finding of the indict-
ment. Hence, there is nothing in it.

Another assignment of error is the overruling of motions to
quash the *venire facias,* the panel of twenty jurors and the
panel of twelve. The *venire facias* was issued December 7th
and the term began January 7th following. Hence it was is-
sued thirty days before the term as required by law. But the
summons requiring the jury commissioners to appear and draw
the jurors was not issued at the same time as required by law.
It was issued on the 3rd day of December and made returnable
on the 7th for convenience, as is supposed, to the end that the
list of jurors drawn might be delivered to the sheriff with the
writ. One of the commissioners failing to appear, the clerk
appointed a special commissioner in the manner prescribed by
law. These departures from the statutory requirements are
slight and only in respect to time. Time is not of the essence
of them. They are directory in this particular and substantial
compliance therewith is sufficient. *Wash's Case,* 16 Grat. 530,
approved in *Spurgeon's Case,* 86 Va. 652; 12 Ency. Pl. & Pr.
277; Thomp. Tr. ss. 15, 19.

Over two hundred pages of the record are taken up with evi-
dence relating to alleged misconduct on the part of the jury.
It consisted in this: The jurors were kept by the sheriff in a
hotel, six of them in a room on one floor and the others in an-
other room on another floor of the building. There was only
one officer with them and he remained with those on the lower
floor. Occasionally members of the jury went to a privy out-
side of the building and at the rear of the lot. They were gen-
erally accompanied by the sheriff, while the other jurors re-
mained in their rooms unattended, but on more than one oc-
casion a juror went alone to the privy. Relatives and friends
of the deceased boarded in the building at the time and some of
them on the same floor on which was the room occupied by the
six jurors who were not attended by an officer. In addition to
this the officer took the jurors to various places about the town.
On one occasion, they all went to a barber shop where some of
them were shaved, and there were other persons in the shop at
times while they were there. The deputy attending them on
that occasion left them in the barber shop and went out for
probably five minutes, but he says he left another officer in
charge while he was gone. It is also said that on this occa-

sion the deputy went into the bar connected with the barber shop and took a drink. On another occasion, one of the jurors had a conversation with a person not a juror in the presence of the officer, and was handed by said person a piece of paper which he read and then tore up. The juror says it was an order which he had given the man for some money, and the debtor not having paid it, it was returned and, after tearing it up, he threw the paper in the fire after going back to the house.

To warrant the setting aside of the verdict, it is not enough that there has been a mere separation of a jury, even without the attendance of an officer, or that there has been misconduct of the jury in the presence of the officer. Such separation or misconduct only raises a presumption in favor of the prisoner that the irregularities have been prejudicial to him and throws upon the prosecution the burden of showing, beyond a reasonable doubt, that the prisoner has suffered no injury by reason of the separation or misconduct. *State* v. *Cartwright*, 20 W. Va. 32; *State* v. *Robinson*, 20 W. Va. 713; *State* v. *Harrison*, 36 W. Va. 729; *State* v. *Cotts*, 49 W. Va. 615. It is further held in these cases that the jurors and officers are competent to testify in relation to the facts and circumstances attending such separation and misconduct, but not to show by what motive they were actuated or that any admitted fact, misconduct or irregularity had no influence or effect upon their minds in producing the verdict. All the jurors in this case testified fully as to every thing that occurred and showed conclusively that nothing occurred which could have prejudiced the prisoner. The judge of the court below having seen and heard all of these witnesses testify, had a far better opportunity to ascertain what the facts were and whether they were such as to prejudice the prisoner than this Court has and his finding in reference to that matter is entitled to great weight. Aside from that, nothing has been shown in all this testimony which is deemed to have been prejudicial.

There is no error in the judgment and it is affirmed.

*Affirmed.*

DENT, PRESIDENT, (*dissenting*): .

In my opinion there has been a miscarriage of justice in this case resulting from a misapprehension of the law and the mis-

instruction of the jury. The deceased was engaged in committing a forcible trespass on the premises of the prisoner, in defiance of the law and armed with a dangerous weapon, although warned not to do so. While thus engaged in perpetrating his unlawful act in a threatening manner, the prisoner shot him in defence of his property and possibly of his person.

In the case of the *People* v. *Payne,* 8 Cal. 341, Harigan & Thompson, Cases of Self Defence, 863, it was held that "The owner of property in the possession of the same has a right to use such force as is necessary to prevent a forcible trespass; and where a trespasser goes with the intent and with the means to commit a felony, if necessary to accomplish the end intended, the owner of the property may repel force by force to the extent of killing the aggressor." Cooley's Blackstone, 2 Vol. B. 4, 180.

The law of defence of person or property as against a forcible law-breaker is a natural right of which a person cannot righteously be deprived by the laws of the land, and it justifies such means and force as the necessity of the case requires. As is said by Rutherford in his Institutes, "That law allows us to defend our persons or property, and such a general allowance implies that no particular means of defence are prescribed to us. Whatever means are necessary must be lawful; because it would be absurd to suppose that the law of nature allows of defence and yet forbids us at the same time to do what is necessary for this purpose. It follows that he who attempts to injure us gives us an indefinite right over his person, or a right to make use of such means to prevent the injury as his behavior and our situation make necessary. * * * The right of defending our goods is an indefinite one, and we are not naturally debarred from proceeding to extremities in their defence, where the obstinate injustice of those who would deprive us of them renders this necessary." *Gray* v. *Combs,* 7 J. J. Marshall (Ky.) 478, 23 Am. Dec. 431. The question presented by the undisputed evidence was not one of slight provocation or of a mutual combat or of a mere trespass free from malice and force. Hence instructions Nos. 1, 2 and 5, given for the State while properly propounding the law, were not applicable to the case and undoubtedly misled the jury. The real question being as to whether the prisoner used such force as the unlawful, wilful and malicious conduct of the deceased

made necessary for the . protection of his person and property, the court should have so instructed the jury, and not have directed their minds by instructions calculated to give them a wrong view of the issue involved. If the court does not know the law governing a case, how can a jury be expected to know it?

If the forcible, unlawful, malicious and wilful conduct of the deceased had been presented to the jury in its true legal light they would not have found a verdict for murder in the first degree. The prisoner is thereby made to suffer for the death of the deceased brought on by reckless and lawless indifference to the just rights of others. This may be the end of human law, but it is not justice.