# CHARLESTON.

STATE v. KELLISON.

Submitted February 18, 1904.    Decided March 1, 1904.

1.  FELONY.—*Discharge of Prisoner—Speedy Trial.*

    The fact that the record in a felony case shows that more
    than three terms of the court have passed without a trial, after
    the finding of the indictments, affords no ground for the dis-
    charge of the accused, under section 25 of chapter 159 of the
    Code, from prosecution of the offense with which he is charged.
    It must further appear that he has been held for trial, as well as
    charged with the crime, for such period without a trial.  (p.
    691).

2.  CRIMINAL LAW.—*Record.—Assignment of Counsel to Defend.*

    Failure of the record in a felony case to show that the accused
    had the assistance of counsel therein is not ground for setting
    aside the verdict and granting a new trial, if it does not affirm-
    atively appear that the accused was denied the privilege of
    counsel guaranteed to him by section 14 of article 3 of the Con-
    stitution.  (p. 692).

3.  CRIMINAL LAW.—*Jury Trial.—Record.*

    It is not necessary to a legal conviction on a charge of felony
    that the order showing the empaneling of the jury recite that
    the jurors so empaneled were good and lawful men.  (p. 693).

4.  CRIMINAL LAW.—*Jury Trial.—Record.*

    If, in such case, the order recite that the jury were "sworn
    the truth to speak upon the issue joined," without more re-
    specting the oath, and it does not appear that any objection was
    made to the form of the oath administered, it is presumed that
    the jury were properly sworn.  (p. 694).

5.  CRIMINAL LAW.—*Record—Performance of Officer's Duty Pre-
    sumed.*

    Failure of the record in a felony case to show that, upon an
    adjournment, the court instructed the officer into whose charge
    the jury were given, to keep them together and not to converse
    with them or permit any one else to do so, is not ground for
    setting aside the verdict.  Although it is usual and proper to
    give such instruction, the law does not require it, for the statute
    makes it the duty of the officer to do the things above men-
    tioned without any instruction.  (pp. 694, 695).

6.  CRIMINAL LAW—*Instructions—Reasonable Doubt.*

    When, in a trial of a felony case, the court instructs the jury
    at the instance of the defendant that, in order to convict, they

must believe from the evidence beyond all reasonable doubt that the accused is guilty, it is not error to give, at the instance of the State, another instructon to the effect that such reasonable doubt is not a vague or uncertain doubt and that what the jury believe from the evidence as men they should believe as jurors. (p. 697).

7. CRIMINAL LAW—*Instructions—Intent—Malice.*

The giving, in such case of the following instruction, though not as perspicuous as it ought to be, is not error: "The court instructs the jury that to convict a person of murder it is not necessary that malice should have existed in the heart of the accused against the deceased, and if they believe from the evidence that the accused with a deadly weapon, shot and killed the said Julia Simmons, the intent and the malice may both be inferred from such act." (p. 698).

8. CRIMINAL LAW—*Instructions, How Construed.*

Instructions to the jury must be taken and read as a whole, and, if, upon being so read and construed, they state the law correctly, and do not misstate it in any particular, and no proper instruction, asked for, has been refused, the verdict will not be disturbed on the ground that additional proper instructions could have been given, or that some particular instruction, standing alone, might tend to mislead the jury. (p. 699).

Error to Circuit Court, Pocahontas County.

Jerome Kellison was convicted of murder in the first degree, and brings error.

*Affirmed.*

C. H. SCOTT, for plaintiff in error.

THE ATTORNEY GENERAL, for the State.

POFFENBARGER, PRESIDENT:

Jerome Kellison, convicted of murder of the first degree, in the circuit court of Pocahontas county, and sentenced to life imprisonment, complains of alleged errors in the judgment.

The order entered on the 4th day of October, 1899, merely shows the return of the indictment, and no other order in the case was made until the 2d day of October, 1901, when the accused was arraigned and entered his plea of not guilty and took a continuance. As more than three regular terms of the court, after the finding of the indictment, had passed without a trial, and the record did not show any of the reasons therefor, that, under the statute, section 25 of chapter 159 of the Code, excuse

such failure, it is said that he was entitled to his discharge from prosecution for the offense. "Every person charged with felony, and remanded to a circuit court for trial, shall be forever discharged from prosecution for the offense," if there be such failure unless certain specified reasons therefor are shown. The accused does not appear by the record to be within the provisions of this statute. It does not show that more than three terms had passed without a trial after he was taken into custody. He had not been arraigned, nor entered any plea, nor, so far as is disclosed by the record, had he been remanded to the circuit court for trial. There can be no presumption that, at any time before October, 1901, he had demanded or desired a trial or was so situated that the court could try him. The fact is, as shown by the testimony, that he was never arrested on the charge until May, 1901. Had he moved for a discharge before going to trial, this fact would have precluded it. If, after trial and conviction, he could demand his discharge in this Court, at this late day, that fact would clearly bar him here as the record shows it. The word "remanded" in said section is not consistent with the present statutory provisions relating to procedure in felony cases. Since the necessity of a preliminary examination as a prerequisite to trial has been dispensed with, and indictments are no longer found in courts having no jurisdiction to try on charges of felony, the expression is inaccurate. But, under the Code of 1860, and the statutes as they existed prior thereto, it was consistent with other provisions and only applied to persons in custody or under recognizance. Hence, it can only apply under such conditions now, and is to be construed as if it read "held" for trial instead of "remanded" for trial. In Virginia the statute, as amended, so reads. *Kibler* v. *Com.,* 94 Va. 804.

No order entered in the case except the one in which the verdict is recorded discloses that the accused had the assistance of counsel, and an assignment of error is based upon the failure of the record to show that fact. The trial seems to have been in progress on three successive days but there is no mention of counsel until the third day. Nothing in this record indicates that he asked for the assistance of counsel, or that he was denied it, or that he did not have it. The Constitution does not make assistance of counsel a prerequisite to conviction as it does a trial by jury. The clause contains no prohibitory language. It

only says he shall have the assistance of counsel. The common law did not permit persons charged with felony to have the advice and assistance of counsel, and this clause of section 14 of article 3 of the Constitution was inserted to cure the shameful defect of the common law in this respect by guaranteeing said right to such persons. Cooley's Cons. Lim. 474. Even if said clause makes it the duty of the State to furnish counsel when demanded, it does not follow that such action is to be taken unless demand therefor has been made, nor that the silence of the record on the subject raises a presumption of the denial of the privilege. This clause is in the same section with the one which says the accused shall be confronted with the witnesses against him, under which it has been held to be reversible error to permit the examination of witnesses in the absence of the accused. *State* v. *Sheppard,* 49 W. Va. 582; *State* v. *Greer,* 22 W. Va. 800; *State* v. *Sutfin,* 22 W. Va. 771; *State* v. *Conkle,* 16 W. Va. 736; *State* v. *Younger,* 2 W. Va. 579. In those cases it was held that the record must affirmatively show the presence of the accused at all stages of the trial. But, in arriving at that conclusion, the court very properly read that clause in connection with the constitutional inhibition of a condviction without a trial by jury, and the testimony of the witnesses is an inseparable part of the trial. The assistance of counsel is a matter of a different kind. Both at common law and under our Constitution, a trial in a felony case may be had without the assistance of counsel. The prisoner himself may be learned in the law and skilled in its practice. Can it be said that it is the duty of the court, or was the intention of the framers of the Constitution, to compel a man to accept the assistance of counsel whether he desires it or not? Even in the case of the personal presence of the accused at the trial, the presumption of regularity operates to some extent. It is sufficient to show his presence at the commencement of the proceedings of any day, and, if the record does not affirmatively show his absence thereafter, his presence is presumed to have continued throughout the session.

Although it appears from the record that the jury were selected and tried, an assignment of error is predicated upon the failure of the order to say they were "good and lawful men," but it is not insisted upon in the argument. The record shows no objection to the jurors or any of them on the ground of incom-

petence or disqualification, and, as a rule, there is a presumption in favor of the regularity of the procedings of a court of general jurisdiction. In felony cases, there are some exceptions to the rule, but no reason is perceived why the record should affirmatively show these formal words. The observations hereinafter made, respecting the oath of the jurors, apply here with equal force.

Another objection is that the jury were not sworn to return a verdict according to the law and the evidence. The order recites that they were "sworn the truth to speak upon the issue joined." Under several decisions of this Court, this is sufficient. The record does not purport to set out the form in which the oath was administered, nor show anything which negatives the presumption that it was in the usual form. In *Lawrence's Case,* 30 Grat. 849, the order recited that the jury "were sworn the truth of and upon the premises to speak." Moncure, President, delivering the opinion of the court, said: "And the effect is the same, as if it had been said, that the jury were sworn, "well and truly to try and true deliverance make between the commonwealth and the prisoner at the bar and a true verdict render according to the evidence." The prisoner and his counsel were in court, when the jury were sworn, and might and no doubt would have objected, if the jury were not properly sworn. The fact, that no objection was made, shows that they were properly sworn. It is not necesary, that the form of the oath administered to jurors on the trial of a felony case should be copied into the record; it is sufficient, that the record shows they were duly sworn." This language is quoted with approval by JOHNSON, PRESIDENT, in *State* v. *Sutfin,* 22 W. Va. 771, 773, and it clearly covers the objection raised here. The syllabus in *State* v. *Sutfin* says: "It is not necessary, that the form of the oath administered to a jury in a felony case should be entered on the record; it is sufficient, if the record shows that the jury were duly sworn." To the same general effect see *State* v. *Ice,* 34 W. Va. 244; *State* v. *Musgrave,* 43 W. Va. 672; *Russell* v. *State,* 10 Tex. 288; *Wrockledge* v. *State,* 1 Ia. 168; *State* v. *Ostrander,* 18 Ia. 436.

A further objection is that the jury were given in charge of the sheriff of the county and one of his deputies "with instructions to keep them together without communication with any

other person and not to speak to them relative to this trial." This is the recital of the record, which does not show the name of the deputy. This Court cannot presume, in the face of the recital of the record that the person to whom they were given in charge was not a deputy sheriff, and the name of the deputy is wholly immaterial, as any one of the deputies was a person qualified for such duty. The instructions to the officer, as recited in the order, were not in the language of the statute, but they substantially conformed to it so far as the order purports to set them out. No objection was made or exception taken for want of proper instructions, nor does the statute say the court shall give any instruction to the officer, though it is usually done, in the form of an oath administered to the officer. This Court has decided that the oath is unnecessary and imposes no additional obligation upon the sheriff. The law makes it his duty without any instruction from the court. *State* v. *Poindexter*, 23 W. Va. 805.

At the instance of the State, several instructions were given over the objection of the defendant. As the propriety of giving them depends upon the character of the evidence, a brief statement of the material facts becomes necessary. Kellison's victim was Mrs. Julia A. Simmons, who was killed in her own door yard at about ten o'clock at night by a pistol shot fired by him and which took effect in the right breast. Her daughter and several other persons were on the porch but a few feet distant from the gate at or near which she and Kellison were standing when the shot was fired. But whether any of them actually saw what occurred between the accused and the deceased at the moment the shot was fired is not made clear by the evidence. Kellison was more or less intoxicated and had come to the place a short time before the killing in company with Charles Apperson, another young man, in quest of two girls, Ess Clunen and Eliza Campbell. On the evening before, they had called upon these girls at the home of Elizabeth Clunen, the mother of Ess Clunen, and had possibly arranged to see the girls at the same place on the evening of the homicide. Apperson says they had, but other witnesses state the contrary. At any rate, they went and were informed upon their arrival that the girls had gone to Mrs. Simmons's that day to work, but would return that evening. After waiting for some time, Kellison and Apperson

started to meet the girls, taking with them Jason Clunen, a young boy, and brother of Ess Clunen. Not meeting them, they went on to the premises of Mrs. Simmons, a distance of two or three miles. Instead of going to the house, they sent Jason Clunen in to tell his sister that her sister at home was sick and that she must return at once. She started out accompanied by Lucy Simmons, a daughter of the deceased, and being in distress over the news, she was informed by her brother that her sister was not sick, but that the boys were down at the fence and wanted to see her and Eliza Campbell and take them back home. Later, Apperson went to the house, but Kellison did not. The evidence shows that he was noisy, abusive and indecent in his language and fired one or more shots from his pistol while in conversation with the girls and Mrs. Simmons. He made threats against one John Edmiston, of whom he was jealous, saying he had come there to kill him. Mrs. Simmons had interposed an objection to the demand that the girls go home that night, and Kellison used abusive and offensive language toward her. It seems that at one time he retired from the fence near the house, but came back, and, in the meantime, Lucy Simmons had armed herself with a sword. Kellison was ordered to leave the premises, but, instead of going, he continued to make threats and use abusive and indecent language. Mrs. Simmons took the sword from the hands of her daughter and went to the gate, saying that she would protect her house and her children from him or that she would make him leave. As stated, the daughter and others, including Ess Clunen and Charles Apperson, were on the porch, in front of which there were some hop vines which may have obstructed the view of what transpired at the gate. They say, however, they heard Kellison order Mrs. Simmons to stand back, and that immediately afterwards, the shot was fired which killed her almost instantly. Apperson testifies that there was a cut on Kellison's hand which might have been made by the sword. He had a ring on a finger of that hand which also had an indentation, which might have been made in the same way.

The first instruction was objected to because it tells the jury they may believe or refuse to believe any witness and that when passing upon the credibility of a witness, they may take into consideration his interest in the matter in controversy and his

demeanor upon the witness stand. It is said this instruction conveyed an intimation to the jury that some of the evidence must be disbelieved, and that they might reject that part of it which was favorable to the accused. Though probably a little informal, the instruction states the law correctly, and, though there was very little conflict or inconsistency in the statements of the several witnesses, it is not perceived that the instruction could have had any such effect as is claimed. It does not refer to the evidence of any particular witness and leaves all questions of credibility to the jury.

Instruction No. 2 told the jury that a reasonable doubt was not a vague or uncertain doubt, and that what the jury believe from the evidence as men, they should believe as jurors. This, taken in connection with the instruction given for the defendant, saying it was the duty of the State to prove the accused guilty beyond all reasonable doubt in order to convict, state the law with sufficient accuracy. They were told that their belief must be founded upon the evidence and that a vague and uncertain doubt is not a reasonable doubt within the meaning of the law. How there could be any difference between their belief as men and their belief as jurors is not perceptible. Being jurors, they were still men, and the only belief possible is that which fastens itself upon the human mind and they were told that it must be belief beyond all reasonable doubt. All the authorities say that reasonable doubt is difficult to define, but that its meaning is not difficult for a jury to comprehend. *State* v. *Sheppard,* 49 W. Va. 582, 609, 610. As the jurors were acting under oath, it cannot be assumed that they were men of such feeble understanding as to deem themselves relieved from the obligations thereby imposed by the terms of the instruction.

Instruction No. 3 told the jury that a man is presumed to intend that which he does or that which is the immediate or necessary consequence of the act. As far as it goes, this is old and sound law.

Instruction No. 4 was in substance that if the jury believed the deceased had come to her death from a pistol shot at the hands of the accused and he relied upon self defense, the burden was upon him to show it by a preponderance of the evidence. This is good as far as it goes, and if it is incomplete in any

respect the deficiency is supplied by the full instruction on the subject of self defense given at the request of the defendant.

Instruction No. 5 is in substance the usual one to the effect that when a homicide is proven, it is presumed to be murder of the second degree, and that the burden is upon the State to elevate it and upon the prisoner to reduce it.

Instruction No. 6 is point 11 of the syllabus in *Cain's Case,* 20 W. Va. 679, which is as old almost as the criminal law.

Instruction No. 7 reads as follows: "The court instructs the jury that to convict a person of murder it is not necesary that malice should have existed in the heart of the accused against the deceased, and if they believe from the evidence that the accused with a deadly weapon, shot and killed the said Julia Simmons, the intent and malice may both be inferred from such act." The court evidently meant to say that express antecedent malice is not a necessary element of the crime and that proof of express malice was unnecessary, all of which is sound law, and it was certainly proper to say that if the jury believed from the evidence that the accused had shot and killed the deceased, they might infer from the act both malice and the intent to kill. Though the instruction does say it is not necessary that malice should have existed in the heart of the accused against the deceased, this statement is qualified by what follows, and the instruction as a whole tells the jury that malice is an element of the crime, but that it may be inferred from the act of taking life with a deadly weapon, and the jury could not have reasonably construed it to mean more than that proof of express malice was unnecessary. It could have been more perspicuously stated, but verdicts are not set aside for rhetorical imperfections or awkward phraseology in instructions, when the meaning intended to be conveyed is clearly manifest.

Instruction No. 8 reads as follows: "If the jury believes from the evidence that the prisoner, Jerome Kellison, went to the home of Mrs. Julia Simmons with a deadly weapon for the purpose of committing a felony or some other illegal purpose, or that the prisoner formed that purpose after coming on the property of Mrs. Julia Simmons, he was from that moment a trespasser, and it was *is* duty to leave when ordered away by Mrs. Simmons; And Mrs. Simmons had a right to use all forces

necessary to make the prisoner leave; And if the prisoner refused to leave after repeated orders, to go from the deceased, and used abusive, insulting and blackguarding language to her, and upon the deceased going towards the prisoner with a saber in her hand, from her front door saying she intended to protect her home and children and that the prisoner should leave; The prisoner continued to curse and blackguard the deceased and her family, refused to leave and drew a pistol and shot and killed the deceased, they must find the prisoner guilty *if* murder in the first degree; Unless they further believe from the evidence that the prisoner had reason to believe, and did believe he was in imminent danger and could not retreat without endangering his life, or great bodily harm." If it can be said that this instruction conveys an intimation that the deceased had the right to make a deadly assault upon the accused upon his refusal to leave, such intimation can be nothing more than a mere inference from the language used. The instruction does not say she had the right to kill or maim, but only that she might use such force as was necessary to compel his retirement from the premises. The other instructions given in the case both for the State and the defendant leave no room for any such inference. The jury were plainly and repeatedly told that, if he fired the shot under such circumstances as made it lawful to do so, naming them, although upon the grounds of the premises of the deceased, he was guilty of no offense, and also that if the prisoner was upon the grounds of the deceased without legal right, and using profane language, the deceased was not justified in attacking him with, or attempting to eject him by the use of, a deadly weapon. The instructions must be taken and read as a whole, and, if, upon being so read and construed, they propound the law correctly, and do not misstate it in any particular, they afford no ground for setting aside the verdict. The last clause of the instruction propounds the law correctly. The accused was in fault. On this question, there is no conflict in the evidence. He brought on the quarrel. Having done so, nothing could justify his taking the life of the deceased except the necessity of doing so in order to save his own life or prevent the infliction upon him of great bodily injury. There are two grounds upon which a man may stand his ground and, if need be, kill his adversary, when he has opportunity to es-

cape by retreating. When the attack upon him is made with murderous intent, with a sufficient overt act, he is under no duty to fly. Bish. Cr. Law, § 850; *State* v. *Clark,* 51 W. Va. 457. When one is assaulted in his own dwelling house, he need not retreat, but he cannot take the life of his adversary unless it is necessary, in order to save his own life or prevent other felony. *State* v. *Clark,* cited; Bish. Cr. Law, § 858; *Beard* v. *United States,* 158 U. S. 550. Exceptions are taken to some clauses of the instruction on the ground that they are incorrect recitals of the evidence, but a careful examination shows that they are not recitals. They constitute a hypothetical statement of facts as to which there is evidence, leaving it to the jury to determine whether they are established.

As it does not appear that the court erred in any of its rulings, the judgment will be affirmed.

*Affirmed.*