# CHARLESTON.

## STATE *v.* ZEIGLER.

Submitted January 31, 1895—Decided April 13, 1895.

1. HOMICIDE—SELF-DEFENSE—MANSLAUGHTER.

   If an assault is made upon a man with an attempt to commit a felony upon him, he may resist so far as it is necessary to resist the assailant, even if he must take the assailant's life. But this has a limitation. If he can resist the assault and free himself without taking life, and kills the assailant without necessity, he is not excusable. If mere heat of blood impels him to take life in such case, he is guilty of manslaughter.

2. HOMICIDE—SELF-DEFENSE—JUSTIFIABLE HOMICIDE.

To reduce homicide in self-defense to excusable homicide, it must be shown that the slayer was closely pressed by the other party, and retreated as far as he conveniently or safely could, in good faith, with the honest intent to avoid the violence of the assault.

3. HOMICIDE—SELF-DEFENSE—APPARENT DANGER.

Where one without fault himself, is attacked by another, in such a manner or under such circumstances as to furnish reasonable grounds for apprehending a design to take away his life or to do him some great bodily harm, and there is reasonable ground for believing the danger imminent that such design will be accomplished, and the person assaulted has reasonable ground to believe, and does believe such danger is imminent, he may act upon such appearances, and, without retreating, kill his assailant, if he has reasonable grounds to believe, and does believe that such killing is necessary in order to avoid the apparent danger; and the killing under such circumstances is excusable, although it may afterwards turn out that the appearances were false, and that there was in fact neither design to do him some serious injury, nor danger that it would be done. But of all this the jury must judge from all the evidence and circumstances of the case.

4. INSTRUCTIONS—EVIDENCE—JURY—IRRELEVANT INSTRUCTIONS.

It is error in a court, in a case of felony, to give to the jury instructions which are not relevant to the evidence, and which may mislead the jury to the prejudice of the defendant.

5. EVIDENCE—CONFLICT OF EVIDENCE—JURY.

If there be, in the opinon of the jury, a substantial conflict in the evidence or circumstances, as to whether the killing was done in self-defense, and the circumstances or other evidence preponderate in favor of self-defense, or if it was equally balanced as to the killing being done in self-defense, the jury ought not to convict either of murder or manslaughter.

6. EVIDENCE—INSUFFICIENT EVIDENCE—VERDICT—NEW TRIAL.

Where a court which tries a cause certifies all the evidence adduced on the trial, and from the evidence so certified it clearly appears that it was wholly insufficient to sustain the verdict, this Court will set aside the verdict, and, in a proper case, award a new trial.

D. B. LUCAS for plaintiff in error, cited 34 W. Va. 117; 17 S. E. Rep. 240; 20 S. W. Rep. 561; 17 S. E. Rep. 108; 8 W. Va. 766; 20 W. Va. 679; 37 W. Va. 813; 3 Greenl. Ev. § 5, note d; 117 N. Y. 71; 123 N. Y. 553; 121 Pa. St. 165; 128 Pa. St. 500; 1 Gray 61; 97 U. S. 237; 1 Bish. Crim. Pro. 1048.

ATTORNEY-GENERAL RILEY for the state, cited 33 W. Va. 370; 8 W. Va. 741; 20 W. Va. 680; Id. 764; 22 W. Va. 801; 5 W. Va. 510; 1 Greenl. Ev. (11th Ed.) § 449.

FOREST W. BROWN for the state, cited 36 W. Va. 691, 701; 20 W. Va. 680, 681, 679, 713, 764; 37 W. Va. 812, 820, 821; 32 W. Va. 177; 33 W. Va. 72, 417, 418; 1 Greenl. (14th Ed.) §§ 51, 445, 449; 1 Bish. Crim. Law (14th Ed.) § 849; 2 Id. §§ 184, 707; 25 Gratt. 887.

ENGLISH, JUDGE:

At the April term of the Circuit Court of Morgan county, in the year 1894, the grand jury of said county found an indictment against Rudolph Zeigler; charging that on the 13th day of February, 1894, in said county of Morgan, he feloniously, willfully, maliciously, deliberately and unlawfully did slay, kill, and murder one John Sautters, against the peace and dignity of the state.

The plea of not guilty was interposed, issue joined thereon, and the case was submitted to a jury on the 1st day of May, 1894, which resulted, on the 9th day of the same month, in a verdict of not guilty of murder as charged in the indictment, but guilty of voluntary manslaughter. A motion was made in arrest of judgment, and for a new trial, which motions, having been argued, were overruled by the court, and the prisoner excepted. Judgment was rendered upon the verdict, and the prisoner was sentenced to confinement in the penitentiary for the period of two years, and the prisoner obtained this writ of error.

Self-defense was relied on by the prisoner, and it appears from bill of exceptions No. 8 that after the evidence was concluded, and before the argument commenced, the prisoner, by his counsel, prayed the court to give the jury the following instructions: Instruction No. 1 for defendant: "The court instructs the jury that if from the evidence, the jury be of opinion that there is a substantial conflict of the evidence or circumstances as to whether the killing was done in self-defense, and the circumstances or other evidence preponderate in favor of self-defense, or if it was equally balanced as to the killing being done in self-defense, the jury

can not convict the prisoner either of murder or manslaughter." Instruction No. 2: "The court instructs the jury that the owner of property, in the possession of the same, has the right to use as much force as is necessary to prevent a forcible trespass; and if they find that the defendant was standing upon his own ground, and that in attempting to force a passage over the same, if they so find, the deceased was violating the law, and was a trespasser, with the intent and with the means to commit a felony, if necessary to accomplish the end intended, then the defendant, as owner of the property, if they so find, might repel force by force, to the extent of killing the aggressor, and such killing would be self-defense." Instruction No. 3: "The court instructs the jury that a party who is assailed by his adversary with a deadly weapon is not compelled to retreat, but may slay his adversary, if the assault be so fierce as not to allow the party assailed to retreat without manifest danger to his life, or enormous bodily injury. In such case, if there be no other way of saving his own life, he may, in self-defense, kill his assailant." Instruction No. 4: "The court instructs the jury that if when the deceased fired the fatal shot he was not the aggressor, but was assailed, and such demonstrations of force, with a deadly weapon and otherwise, made against him as to lead a reasonable man to suppose he was in danger of death or great bodily harm, and under such reasonable apprehension he killed the deceased, who was assailing him, if they so find, then the killing was justifiable, in self-defense."

These instructions were objected to by the state, and the court declined to give them, and the prisoner excepted; and the court, on its own motion, gave the jury, in lieu of said instructions, the following: Instruction No. 1: "The court instructs the jury that when one, without fault himself, is attacked by another in such a manner or in such circumstances as to furnish reasonable grounds for apprehending a design to take away his life or to do him some great bodily harm, and there are reasonable grounds for believing the danger imminent, that such design will be accomplished, and the person assaulted has reasonable grounds to believe and

does believe that such danger is imminent, he may act upon such appearance, and without retreating, kill his assailant, if he has reasonable grounds to believe, and does believe, that such killing is necessary in order to avoid the apparent danger; and the killing under such circumstances is excusable, although it may afterwards turn out that the appearances were false, and there was in fact neither design to do him serious injury, nor danger that it would be done. But of this the jury must judge, from all the evidence and circumstances in the case." No. 2: "And the court further instructs the jury that as to the imminency of the danger which threatened the prisoner, Rudolph Zeigler, and the necessity of his killing John Sautters, in the first instance, the prisoner is the judge, but he acts at his peril, as the jury must pass upon his action in the premises, viewing said actions from the prisoner's standpoint at the time of the killing, and if the jury believe, from the facts and circumstances of the case, that the prisoner had reasonable grounds to believe, and did believe the danger imminent, and that the killing was necessary to preserve his own life, or to protect him from great bodily harm, he is excusable for using a deadly weapon in defense, otherwise he is not." No. 3: "The court instructs the jury that, on a trial for murder where a deadly weapon is used, if the prisoner relies on self-defense, the burden of proof is on the prisoner, and he must excuse himself by a preponderance of the evidence." No. 4: "The court instructs the jury that the defendant is, by law, presumed to be innocent, and it is the duty of the state to prove him guilty, as charged in the indictment, beyond all reasonable doubt; and if the state fails to prove every material allegation in the indictment, then the jury must find him not guilty."

The court also, at the instance of the state, gave the jury the following instructions, which were excepted to by the prisoner. The exceptions were overruled by the court: Instruction No. 1: "The court instructs the jury that under an indictment for murder the jury may find the prisoner guilty of murder in the first degree, or guilty of murder in the second

degree, or guilty of voluntary manslaughter, or guilty of involuntary manslaughter, or not guilty." Instruction No. 2: "The court instructs the jury that where a homicide is proven, the presumption is that it is murder in the second degree. If the state would elevate it to murder in the first degree, she must establish the characteristics of that crime; and, if the prisoner would reduce it to manslaughter, the burden of proof rests upon him to establish the same by preponderance of evidence." Instruction No. 3: "The court instructs the jury that if they believe from the evidence that John Sautters came to his death by a pistol-shot wound inflicted by Rudolph Zeigler, and at the time he was so killed the said John Sautters was in the exercise of a right that belonged to him, of passing along a private right-of-way, and that Rudolph Zeigler at said time was wrongfully preventing his passage along said right-of-way, and in so doing, willfully and maliciously, deliberately and premeditatedly, inflicted the wound by which said Sautters came to his death, then he is guilty of murder in the first degree." Instruction No. 4: "The court instructs the jury that where there is a quarrel between two persons, and both are in fault, and as a result of such quarrel a combat takes place, and death ensues, in order to reduce the offense from the degree of murder two things must appear from the evidence and circumstances of the case: (1) That before the mortal wound was given the prisoner declined further combat, and retreated as far as he could with safety; and (2) that he necessarily killed the deceased in order to save his own life, or to protect himself from great bodily harm." Instruction No. 5: Same as last one. Instruction No. 6: "The court instructs the jury that a man shall be taken to intend that which he does, or which is the immediate or necessary consequence of his act; and if the jury believe from the evidence in the case that Rudolph Zeigler, the prisoner, with a deadly weapon in his (prisoner's) possession, without any, or upon very slight provocation, gave to the deceased, John Sautters, a mortal wound, then said Zeigler is *prima facie* guilty of willful, deliberate, and premeditated killing, and *this* throws upon the prisoner the necessity of proving exten-

uating circumstances, and that unless the prisoner has proved such extenuating circumstances, or such circumstances arise out of the case made by the state, the jury must find the prisoner guilty of murder in the first degree."

The prisoner moved the court to set aside the verdict of the jury, which motion was overruled by the court, and the evidence was certified in a bill of exceptions.

The first error assigned and relied upon by the prisoner is as follows: "(1) It was error not to arrest the judgment, and grant him a new trial. The evidence clearly established that the petitioner acted strictly in self-defense, and the homicide was therefore excusable. There was but one witness for the state whose testimony made out a case of murder or manslaughter, and that was Christian Baurle. Upon the contrary, three other witnesses who were present—the prisoner, his son William, and his wife, Louisa Zeigler—all contradicted Baurle, and their testimony tends to exhibit a case of self-defense, and to show that Baurle and the deceased, Sautters, were the aggressors; that Baurle assaulted Zeigler first, and Sautters followed it up by snapping his musket at him, and then clubbing the gun and striking him with the butt end a severe blow, leaving a scar still plainly visible. His evidence is confirmed by Dr. Green, who dressed and probed the petitioner's wound and proves that it was inflicted by some blunt instrument. The state introduced a witness (the wife of the deceased) who proved that she distinctly saw something raised up in the air like the butt of a gun. It is plain therefore, that the jury found against the weight of evidence and this verdict should have been set aside, and a new trial granted."

This assignment of error calls for an investigation of the feeling existing between the prisoner and the deceased, and the immediate circumstances surrounding the parties, at the precise moment when the fatal shot was fired. Trouble existed between the deceased and the prisoner in regard to a road which the prisoner claimed was a private road, and which deceased claimed was a public road. In pursuance of his claim, prisoner had obtained an injunction restraining the use of said road as a public road. On the

day the shooting occurred, the deceased was evidently apprehensive of something which might not only require a witness, but also the use of a gun. He told Baurle he was going to the store, but it must be regarded as an unusual occurrence to carry a musket when merely going to the store. The testimony shows that said Baurle and Sautters had been on the prisoner's premises on the 15th of July previous, with two other men, all armed with guns, and cut down the bars which Zeigler (the prisoner) had constructed across this road. Sautters called on his friend and neighbor, Baurle, who claimed this road as an outlet from his farm, to accompany him as a witness; saying that prisoner stopped him before, and he would like to have some one go along with him. When deceased, carrying his gun, arrived at prisoner's premises, he found him engaged in hauling out manure. Prisoner and his son came out of his barnyard, and prisoner told deceased he had an injunction on that road, and that they should not travel it any more. Baurle says he told him "All right," but heard Sautters say, "It is our road, and we are going to travel it." That Zeigler came up pretty close to him. He stood still. Zeigler stood right in front of him, two or three feet away. Witness told him, "Better stop that;" he did not want to see any bloodshed on this place. That Zeigler struck him first, about his body, with his fist. That he struck back; struck Zeigler on his head; gave him the mark he got on his head. Sautters was four or five steps away. Zeigler's son came up, and took hold of witness, and shoved him back on a bank at the side of the road. When witness raised up and turned around, Zeigler shot him in the arm. Witness then turned and ran. Saw Sautters as he passed. He had his gun on his arm. Was doing nothing. It was an old army gun. This only lasted from five to eight seconds. Witness was running away, and did not see the parties when the fatal shot was fired. Saw Zeigler point pistol towards Sautters. Saw no blood on Zeigler's face after he struck him. This is in substance, the testimony of Baurle, who went with Sautters for the purpose of being a witness.

William Zeigler, who was present, says, as he came out of

the barnyard gate, Sautters came up with his gun pointed at his father. That Baurle had both hands in his pockets, but, as Sautters came up, he out with his left hand, and motioned in front of his father, and said, "Hold on, John, we don't shed cold blood," and his father, facing that way, said, "I neither,"—waving his hands outward, and had nothing in his hands. Sautters still advanced until he held his gun in one and one-half feet of his father. Baurle pulled his right hand out of his pocket, and struck witness' father, and witness came around behind Baurle, and pulled him away. Had no more than caught hold of Baurle than Sautters snapped gun-cap. That he got Baurle away from his father after the cap snapped. Sautters raised his gun up reversed; caught hold of barrel of gun, and struck prisoner over the head with it, and had gun raised to bring it down a second time before prisoner shot. That Baurle got away from witness, and ran into his father, and wheeled him around, and prisoner shot at Baurle, who ran. Sautters stood a little while after he received the first shot, and was fixing at his gun as though putting another cap on. He then looked towards his house, and saw Baurle running, and started and ran also, until he fell.

The prisoner also gave substantially the same statement as to the manner in which the killing was done; stating that he did not shoot Sautters until he had struck him once with the gun over the head, and was preparing to strike him a second time.

According to Baurle's testimony the prisoner was pointing his pistol at Sautters without his offering to strike with the gun, and he states that the wound in prisoner's head was caused by his fist; but Dr. Green states that he found prisoner suffering with wound on left side of head, and also one about the ear or temple; thinks it was inflicted by coming in contact with some blunt instrument; wound could have been inflicted by gun, or instrument of that kind. And Mrs. Sautters, the wife of the deceased, who says she went down to the end of the garden and had a good view, and was near enough to hear what Zeigler said to Baurle about the injunction, when asked on cross-examination, "Did you not say, in

substance, 'In the melee, I distinctly saw a gun in the hands of some one, with butt or breech in the air, overhead of parties'?" answered: "I did say that. I looked since, and saw a locust post that looked just like that."

The witness Baurle further testifies that when he ran, he saw Zeigler point his pistol towards Sautters, and heard pistol cracks coming closer and closer to him; seeking to create the impression that Sautters was retreating and the prisoner pursuing him, at the time he was wounded. But that theory is at once refuted by the fact that the evidence shows that Sautters was shot in the breast. It is then apparent and manifest that this witness, Baurle, was retreating at full speed at the time the fatal shot was fired. He was not in a position to say whether Sautters clubbed his gun and struck the prisoner over the head with it, or not. The prisoner and his son concur in stating that Sautters had struck prisoner over the head with his gun, and was preparing for the second stroke when he received the fatal shot; and it is evident there would have been no necessity for clubbing the gun, had he fired when the cap bursted. Baurle does not mention the stroke inflicted upon the prisoner with the butt of the gun, but states that the wound in Zeigler's head was caused by his fist; and, to place the most charitable construction upon this testimony of his, we must say that Baurle did not see or know what transpired after he received his wound and hastily left the battle ground. The fact that the gun was clubbed and used at some time during the combat does not rest alone upon the testimony of the prisoner and his son, but the wife of the deceased states that she saw the gun brandished above the heads of the combatants; and, unless it was done after Baurle retreated, it is clear that he suppressed a very material and important fact, in delivering his testimony. That the butt of the gun was used upon the head of the prisoner appears from the fact that the prisoner had a contusion on his forehead near his eye, and congestion of the eye, which was evidently the result of the blow received from the fist of Baurle, while Dr. Green, who examined the prisoner's wounds, says he had one wound on the left side of the head, and also one about the ear or temple,

and that the wound was inflicted by some blunt instrument, and could have been inflicted by a gun, or instrument of that kind. Again, Sautters had not been shot when Baurle passed him, running away. Two things then must have transpired in a brief space of time after Baurle passed: The gun was brandished, and Zeigler received the blow, and the fatal shot was fired while Sautters was facing the prisoner, because he received the wound in front, as shown by the testimony of Dr. Ross. Zeigler received the blow from the gun on the left side of his head, as it would naturally be dealt by a right-handed man, facing his adversary. Sautters received the fatal shot immediately after Baurle passed him, for the evidence shows that he followed Baurle, and fell on the road only thirty yards behind him.

This was the case presented to the jury by those who were present, and had an opportunity of seeing what transpired. In addition to this, Mrs. Sautters, the wife of deceased, states that she heard the prisoner tell Baurle "they shouldn't travel that road, and said something about injunction." She also states that prisoner, after firing first shot, fired two more shots at Baurle as he ran.

Now, there can be no question from the testimony that bad feeling existed between the prisoner and the deceased. It appears from the testimony of Isaac Holton: That he was invited to go to Zeigler's, and was told that Baurle and Sautters were going to open this road. It was then obstructed by bars. That he went, and Sautters and Baurle had guns. Zeigler was engaged in hauling hay. That Charles Butte cut the bars down, and he and Zeigler came together in fighting attitude, and Charles Butte pushed or knocked him down. That Zeigler picked up two rocks, and witness told him not to do that—he might get hurt, or hurt somebody—and he threw the stones down and went into his barnyard. Subsequent to that time, the record discloses that repeated threats were made by Zeigler and Sautters on account of the feeling existing in regard to this road. Zeigler appealed to the law for protection, and obtained the injunction, of which he gave Sautters notice at the time he approached, on the day the shooting occurred.

The testimony in the case discloses the deadly hostility entertained by the deceased, Sautters, towards Zeigler. He told Simon Barsore that Zeigler stopped him in the road one time, and "if he'd stop him again he would kill him." Emma Young heard him say he was going to load his gun heavy with buckshot, and be ready for Zeigler. He said to W. H. Poole, "Let that ole booger stop me on that road, and right there is where he kills me, or I kill him." On the day of this fatal occurrence the deceased approached Zeigler (who was at his own home, engaged in his farming operations) carrying his loaded musket, ready cocked, and pointed directly at him. During the struggle between Baurle and the prisoner, deceased displayed his deadly intent by bursting the cap on his gun at him; and after the prisoner had received a heavy stroke from the fist of Baurle, it was followed by a crushing blow on the head from the breech of the gun, and the deceased was preparing to follow it up with another. And it occurs to me that if Zeigler wished anything left in the shape of self to defend, the time for action had arrived. It is true, he was carrying a revolver, and thinking the occasion had arrived when it might be used, he used it with deadly effect; and while it is also true that our statute prescribed a severe penalty for carrying a pistol, yet it expressly excepts from such penalty a person who carries such weapon about his dwelling house or premises. In Whart. Hom., under the head of "Excuse and Justification" (section 480, note 6), the definition of "justifiable homicide" is stated thus (quoted from the opinion of Chapman, C. J., in the case of *Com.* v. *Andrews*): "There is still another definition that needs to be given to you, namely, what constitutes justifiable homicide; for a question may arise here in regard to that subject. It rests upon the right of self-defense. The law regards it as a sacred right, and every man's heart justifies the principle. If an assault is made upon a man, with an attempt to commit a felony upon him, he may resist so far as it is necessary to resist the assailant, even if he must take the assailant's life. But this has a limitation. If he can resist the assault and free himself without taking life, and kills the assailant without necessity, he is not ex-

.cusable. If mere heat of blood impels him to take life, in such a case he is guilty of manslaughter." And in section 8 of the same work the author says: "*Se defendendo,* or in self-defense, which exists where one is suddenly assaulted, and in the defense of his person, where immediate and great bodily harm would be the apparent consequence of waiting for the assistance of the law, and there is no other probable means of escape, he kills the assailant. To reduce homicide in self-defense to this degree, it must be shown that the slayer was clearly pressed by the other party, and retreated as far as he conveniently or safely could, in good faith, with the honest intent to avoid the violence of the assault."

The law never intended, however, that in the circumstances of this case it was the duty of Rudolph Zeigler, the prisoner, to run away from his home, or hide himself, when the deceased (Sautters), accompanied by his friend and witness, came with their guns to force their way through this road. They were warned of the existence of the injunction by Zeigler; and, after the difficulty commenced between Zeigler and Baurle, it must be remembered that the entire combat only lasted, according to the testimony, from five to eight seconds. During that period Zeigler had received a heavy blow on the head from the fist of Baurle, which, according to Baurle's testimony, knocked Zeigler away from him, and turned him around. Baurle had been pulled away and thrown back by William Zeigler (the son) and had rushed again at Zeigler, and received the shot in the elbow, and started to run. Zeigler fired two shots in quick succession after Baurle; and Sautter's gun having failed to shoot, he clubbed his gun, and struck Zeigler over the head, and was raising it for a second stroke when Zeigler fired the fatal shot. Now, if we put ourselves in the place of Zeigler for the few seconds that this combat lasted, and consider that Baurle says "he don't know how hard he struck, and whether he struck once or twice; that he is a coward and if he strikes a man he strikes him good;" and that defendant while staggered and blinded by this blow on the eye and forehead, receives the crushing blow from the butt of the musket in the hands of Sautters—we may well infer that the fierce-

ness of the assault from these two men was such as to preclude all possibility of retreat with any degree of safety, even if sufficient strength remained after these paralyzing strokes.

In the case of *State* v. *Cain,* 20 W. Va. 680, this Court stated the law as follows: "Where one, without fault himself, is attacked by another in such manner or under such circumstances as to furnish reasonable grounds for apprehending a design to take away his life or to do him some great bodily harm, and there is reasonable ground for believing the danger imminent that such design will be accomplished, and the person assaulted has reasonable grounds to believe and does believe such danger is imminent, he may act upon such appearances, and, without retreating, kill his assailant, if he has reasonable grounds to believe that such killing is necessary in order to avoid the apparent danger; and the killing under such circumstances is excusable, although it may afterwards turn out that the appearances were false, and that there was in fact neither design to do him serious injury, nor danger that it would be done. But of all this the jury must judge from all the evidence and circumstances of the case." It is proper just here to call attention to the fact that the prisoner had actually made no demonstration of any kind whatever towards the deceased until after he snapped his gun at him, and after he received the blow on his head with the breech of the gun. Before that his entire attention appears to have been occupied with Baurle. Bishop, in his work on Criminal Law (volume 1, § 865) states the rule thus: "If one who is assaulted (we have seen that there must be an overt act rendering the danger imminent) being himself without fault in bringing on the difficulty, reasonably apprehends death or great bodily harm to himself unless he kills the assailant, the killing is justifiable." Now, that the deceased started from his home with his loaded gun, with the deliberate intention of carrying out his previous threats by killing the prisoner if he came out to him in that road, is manifest from his subsequent actions; by his snapping his gun at prisoner while engaged in combat with Baurle; by clubbing his

musket and attacking prisoner before he had recovered from the stunning blow received from Baurle. That Baurle knew what his intention was is shown by his language when Sautters first pointed his gun at the prisoner—"John, hold on; don't shed cold blood." Turning to the conduct of prisoner, we find that although the deceased, Sautters, came towards him in this threatening attitude, with his gun pointed, and hand about the lock, nothing in the entire testimony shows that the prisoner made any demonstration towards the deceased until after he received the blow from the musket. True, Baurle, who came there as a witness, says, as he ran he saw the prisoner point his pistol towards deceased; but that is met and refuted by the fact that Baurle was running towards, and passing by Sautters; was wounded and frightened himself; and the prisoner fired two shots after him after he commenced running. In this connection we may ask, what is the law, as settled in this state, where self-defense or other justification is set up? Haymond, P., in the case of *State* v. *Abbott*, 8 W. Va. 766, in delivering the opinion of the court, said: "If the circumstances and evidence tend to prove self-defense, or other legal justification, then, as to the question of whether the act was done in self-defense, or other legal justification, if, in the opinion of the jury, a substantial conflict of circumstances or other evidence exists, there should be such a preponderance of circumstances or other evidence against the self-defense, or other justification, as to reasonably satisfy the mind of the jury that the killing was not in self-defense, or justifiable, before they can convict. If there be, in the opinion of the jury, a substantial conflict of the evidence or circumstances as to whether the killing was done in self-defense, and the circumstances or other evidence preponderates in favor of self-defense, and, I should add, if it was equally balanced as to the killing being done in self-defense, the jury ought not to convict of either murder or manslaughter." This Court, however, in a later case (*State* v. *Jones*, 20 W. Va. 764) held that "upon a trial for shooting with intent to kill, the use of a deadly weapon being proved, and the prisoner relies upon self-defense to excuse him for the use of the weapon, the burden of

showing such excuse is on the prisoner; and, to avail him, he must prove such defense by a preponderance of evidence." It is true that the courts in this state and the old state have guarded with jealous care the province of the jury in criminal trials, and have declared more than once their aversion to interference with verdicts, and have announced that although they might have rendered a different verdict if they had been upon the jury, yet they ought not to interfere. Still we find, in the case of *Hill* v. *Commonwealth*, 2 Gratt. 595, it was held that "this court will only set aside a verdict because it is contrary to the evidence in a case where the jury have plainly decided against the evidence, or without evidence;" and in the case of *Grayson* v. *Commonwealth*, 6 Gratt. 712, the law was thus stated, "A new trial will be granted when the verdict is against law, or where it is contrary to the evidence, or where the verdict is without evidence;" and in *Foster's Case*, 21 W. Va. 767, it is held that "where the court which tried the cause certified all the facts proved on the trial, and from the facts so certified, it clearly appears that they were wholly insufficient to sustain the verdict, this court will set the verdict aside, and, in a proper case, award a new trial." The facts and circumstances developed by the testimony in this case are such as, in my opinion, made out a case of self-defense. The fierceness of the assault made upon the prisoner with the musket immediately after he had received the stunning blow from the fist of Baurle was such as to admit of no retreat with safety, and nothing was left him, to save his own life or prevent great bodily injury, but to use his weapon; and I think the jury should have so found, and the court, on motion, should have set this verdict aside.

The next assignment of error is as to the action of the court in excluding the testimony of Conrad Potter as to threats made by Baurle against the prisoner. These threats, whether communicated to the prisoner or not, were admissible to show the prejudice and state of mental feeling on the part of the witness towards the prisoner, and should

not have been excluded; and the same may be said in reference to the evidence offered in regard to the feeling of the witness Lutman, which was excluded by the court.

The fourth assignment of error is as to the exclusion of the testimony of John Johnson as to threats made by the deceased against the prisoner, that he would kill him if he came out to him on that road. It is true that the witness did not mention Zeigler's name in that conversation, but he was talking about this road, and it was well understood what he intended. This threat does not appear to have been communicated to Zeigler; but threats of Zeigler had been shown, and it should have been allowed to go to the jury, in connection with the subsequent acts of the deceased, to show that his going to Zeigler's with his loaded gun was in pursuance of a previously formed design.

The sixth assignment of error is as to the action of the court in excluding the testimony of George Shriver, who after testifying as to his being road surveyor, and about some conversation with prisoner as to whether the road in controversy was a public road, was asked on cross-examintion, if the deceased cut down the bars of Zeigler on said road; and the court ruled that if the defense wished to ask any questions about other conversations, they would have to make him their witness. And, while I think the question would have been proper, if asked in chief, I think it was properly excluded on cross-examination.

The sixth and seventh assignments of error, I think, were well taken. The first relates to the contradiction of the witness W. E. Butts in a material matter, where the foundation had been properly laid; and the second rests upon the same ground.

The eighth assignment of error relates to the action of the court upon the instructions asked for—in refusing all of the instructions asked for by the prisoner, and giving all save one asked by the state. The first instruction asked for by the prisoner was properly rejected, as it fails to state the law as laid down in the case of *State v. Jones*, 20 W. Va. 764. The second instruction prayed by the defendant was properly refused, as I do not think it states the law correctly. Whart.

Hom. § 414, states the law upon that point thus: "A bare trespass against the property of another, not his dwelling house, is not sufficient provocation to warrant the owner in using a deadly weapon in its defense; and if he do, and with it kill the trespasser, it will be murder, and this though the killing were actually necessary to prevent the trespass."

The Circuit Court committed no error in rejecting instructions Nos. 3 and 4, prayed for by the prisoner, for the reason that they are not sufficiently qualified by stating, as was stated in *Cain's Case,* in the instruction given by the court upon this question, in instruction No. 1 for the defendant, "When one, without fault himself, is attacked," *etc.* Instructions 3 and 4 should have contained this qualification, and instructions Nos. 1 and 2, given for the defense by the court, not only contained this qualification, but embodied all that was asked for by the prisoner in said instructions Nos. 3 and 4. It is true, this Court held in *State* v. *Evans,* 33 W. Va. 418 (10 S. E. Rep. 792) that "a party has a right to have his instructions given in his own language, provided there are facts in evidence to support it; that it contains a correct statement of the law, and is not vague, irrelevant, obscure, ambiguous, or calculated to mislead." But, unless they state the law correctly, they should be rejected.

For the foregoing reasons the judgment complained of must be reversed, the verdict set aside, a new trial awarded, and the cause is remanded.

BRANNON, JUDGE:

I doubt whether under the rule of practice in this Court, we should express any opinion upon the evidence, as the case must be retried for other reasons than those arising under the motion for a new trial under the evidence.