# CHARLESTON.

## STATE v. CRAWFORD.

Submitted June 9, 1909.  Decided November 2, 1909.

1.  CRIMINAL LAW—*Transcript—Correction of Error or Omissions—Certiorari.*

    Where necessary to correct errors, defects, or omissions in the original transcript or return filed in an appellate court, an additional or supplemental transcript or return may be ob-

tained on proper application, and, when filed in the appellate court, will be considered as part of the original transcript or return, and a writ of *certiorari* is proper for that purpose.   (p. 117).

2.   HOMICIDE—*Instructions—Self Defense—Applicability.*

On a trial for murder, instructions to the jury asserting defendant's right to stand his ground and not retreat, based on the theory of a deadly attack by deceased on, and on defendant in his dwelling, or castle, are inapplicable where the evidence shows defendant and deceased were at the time of the homicide jointly occupying the house where the killing occurred; the ordinary rules as to self defense, propounded in other instructions given at the request of defendant, alone being applicable.—MILLER, PRESIDENT, dissenting.   (pp. 118-129).

3.   SAME—*Instructions.*

On the trial of one indicted for murder, the evidence may be such as to justify an instruction on the theory of manslaughter, and also on the theory of self defense. These defenses are not necessarily inconsistent.   (p. 124).

4.   SAME—*Manslaughter—Provocation.*

Words alone, however insulting or contemptuous, are never sufficient to reduce murder to manslaughter, at least where a deadly weapon is used; but, when accompanied by the acts of the deceased showing a purpose to commit personal violence on the accused, as by raising and pointing at him a gun, as if in the act of shooting, the accused is entitled to an instruction based on theory of manslaughter.   (p. 125).

5.   SAME—*Instructions—"Heat of Passion."*

An instruction on the theory that the killing, though intentional, was done in the heat of blood, or violent passion, and on adequate and sufficient provocation, reducing the offense from murder to manslaughter, is not bad because it omits the words "without malice," for "heat of passion" necessarily includes "without previous malice."   (p. 127).

6.   SAME—*Instructions.*

A proposed instruction to the jury, telling them that where one kills another, though intentionally, but in passion, in the heat of blood, upon sudden provocation, by gross indignity, *or* by threat of personal violence, was rightly rejected. By the use of the disjunctive "or," the instruction would have justified the murder if only the deceased *threatened* the defendant with personal violence.   (p. 128).

MILLER, PRESIDENT, *dissenting in part.*

Error to Circuit Court, Kanawha County.

66 W. Va.

William Crawford was convicted of murder in the first degree, and he brings error.

*Affirmed.*

*M. M. Robertson* and *D. W. Taylor,* for plaintiff in error.

*William G. Conley,, Attorney General,* for the State.

MILLER, PRESIDENT:

The indictment charged defendant with the murder of A. Murphy on the —— day of September, 1907. The jury found him guilty of murder in the first degree, as charged, and that he be punished by confinement in the penitentiary during his life. From the judgment of imprisonment on said verdict pronounced by the intermediate court of Kanawha county, and affirmed by the circuit court on appeal, defendant has brought error to this Court.

The original transcript of the record in the intermediate court, as certified to the circuit court, showed that the jury were "sworn to well and truly try and true deliverance make between the State of West Virginia and the prisoner at the bar, and a true verdict render according to the evidence *in part.*" The circuit court, on suggestion and motion by the prosecuting attorney, awarded a writ of *certiorari,* directed to the clerk of the intermediate court, returnable forthwith, requiring him to certify the record more fully to the circuit court, and at the same time produce the record book of said court, containing the true order, showing the oath actually administered to the jury. This action of the circuit court was objected and excepted to, and it is the first point of error relied on.

The record shows that the case was heard on appeal in the circuit court on the original transcript of the record, and a true copy of the order of November 13, 1907, returned by the clerk in response to said writ of *certiorari,* and the original record book containing said order produced for the inspection of the court; and the court finding as a fact that said order had not been correctly certified in said original transcript, but was correctly certified in the copy thereof certified and filed by the clerk with his return to said writ, ordered the said certified copy filed and made part of the record; and, finding no other error therein, affirmed the judgment below.

The true and correct order of November 13, 1907, shows the omission therefrom, in the original transcript, of the words, "and having heard the evidence," immediately after the words "according to the evidence," and before the words, "in part were committed to the sheriff." But it is urged by counsel for the prisoner, with apparent confidence, that on bare suggestion, and without evidence in support thereof, it was error to the prejudice of the prisoner, justifying reversal, for the circuit court, by *certiorari,* to have brought up the true record of the oath of the jurors before giving judgment on the appeal. Section 12 of Article VIII of the Constitution, and section 3620, Code 1906, gives the "circuit court supervision and control of all proceedings before justices and other inferior tribunals, by *mandamus,* prohibition and *certiorari."* If statutory authority was necessary to justify the action of the circuit court, may it not be found here? But in Virginia, as early as *Terrell* v. *Ladd,* 2 Wash. 150, 151, *certiorari* was awarded to supplement the record filed on mere suggestion of counsel; and in this State, in *State* v. *Tingler,* 32 W. Va. 546, a felony case, the first point of the syllabus is: "On suggestion of diminution of the record a writ of *certiorari* is effectual to bring to this Court the true and correct record, no matter in what respect the transcript, as certified in the first instance, may vary from or misrepresent such record." For a discussion of the office of the writ of *certiorari* in appellate proceedings and for the authorities on the subject applicable to this case, see the opinion of the Court, by Judge BRANNON, in the *Tingler Case.* In 3 Cyc. 105 it is said: "Where necessary to correct errors, defects, or omissions in the original transcript or return as filed in the appellate court, an additional or supplemental transcript or return may be obtained upon proper application, and, when filed in the appellate court, it will be considered as part of the original transcript or return, and the assignment of errors upon the original will be sufficient." Clearly the judgment of the circuit court on this point should be affirmed.

On the merits, numerous errors assigned in the petition are apparently, and, we think justifiably, abandoned in the arguments and briefs of counsel for the prisoner. We will, therefore, confine ourselves to the points of error relied on respecting the prisoner's instructions numbered six, seven, eight and nine

refused.  And first as to instructions six and seven.  The court in other instructions given covered defendant's theory of self defense, including his right to stand his ground without retreating, and to kill his assailant, if necessary to protect his own life, but refused his instructions six and seven; the first covering his theory of an attack by deceased *on* his dwelling, and also upon him *in* his dwelling house or castle, the first covering both theories, but the latter covering only the theory of an attack upon him *in* his dwelling; and also refused his instructions eight and nine, covering another theory that the killing had been done in passion, in the heat of blood, upon sudden provocation by gross indignity or threat of personal violence.  The views I am about to express in respect to instructions six and seven are for the most part my personal views, for, while my associates agree with me that the court rightfully rejected instruction six, for the reason given by me, they are further of the opinion, for reasons to be given in a note, that it and number seven were rightfully rejected because inapplicable to the facts proven, and would have tended to mislead and confuse the jury; the rights of defendant on the subject of self defense being, in their opinion, fully covered by defendant's general instructions number ten and eleven given by the court.

Omitting the words "and endeavors by violence," in parenthesis, not in the instruction as proposed, instruction number six would have told the jury "that the dwelling house where a man lives is his home or castle, and that he may repel force by force in defense of his person, habitation, or property against one who manifestly intends (and endeavors by violence) to commit a known felony on either, and in such case he is not bound to retreat, but may pursue his adversary until he has secured himself from all danger, and if he kill his adversary in so doing it is justifiable self defense;" number seven, that if attacked in like manner "*in* his own house by a person armed with a dangerous weapon, and he has reason to believe and does believe, he is in danger of losing his life, or in danger of suffering great bodily harm at the hands of his assailant, he is not required to retreat, but may defend his life or person by taking the life of his assailant without retreating."  Instruction number six, with the words in parenthesis, is identical with defendant's instruction number nine, approved in *State* v. *Manns,* 48 W. Va. 480,

486; and number seven is the same as defendant's number three given, and apparently approved, in *State* v. *Hobbs,* 37 W. Va. 812, 820. The attorney general argues that, had there been any evidence justifying number six, the omitted words rendered it fatally defective, and that it was properly rejected for this reason; that, as proposed, this instruction justified the killing if only the deceased "manifestly intended" to commit the felony, ignoring the overt act covered by the omitted words, "and endeavors by violence." The language "manifestly intends and endeavors by violence," employed in instruction nine, in *State* v. *Manns,* is that used in East's Plea of the Crown, and by Wharton and other text writers, and in many decisions of the courts, to describe the circumstances and conditions justifying the killing of an assailant. *Beard* v. *United States,* 158 U. S. 550, 562-3. And so universally has this language been used in practice, and become so imbedded and fixed in our jurisprudence that I would hesitate greatly to depart from it in the administration of so important a branch of the law as justifiable homicide unless words of equivalent import were employed. The theory of this law is that an attack has been made on one's dwelling or castle, and that it has become necessary for him to meet force with force to protect himself or his person and property therein from such outside invasion, and I think the language of the books, "and endeavors by violence," adequate and necessary to cover this element in the law of self defense. I am not prepared to say, therefore, that the word "manifestly," used in the instruction, is competent to convey to the jury the meaning intended by the omitted words. While the language of some decisions, and of some text writers, may seem to justify a less rigorous rule in the use of the language of instructions, I think, when carefully examined, they will be found not to do so in fact, but to hold that the intention of the assailant to commit the offense must be manifested by some overt act of violence, as approaching with a deadly weapon for the purpose of attack, or already drawn in the act of felonious assault. The views here expressed are well illustrated in *Beard* v. *U. S. supra,* and in *Erwin* v. *State,* 29 Ohio St. 186, cited therein, and also in our own case of *State* v. *Cain,* 20 W. Va. at page 701; also in *People* v. *Lewis,* (Cal.) 59 Am. St. Rep. 167. *Beard* v. *U. S,* reversing the judgment below, extends the doctrine of self

defense *in* one's dwelling or castle, to his premises near by. Approving the general proposition contained in the instruction given, the court, by Justice Harlan adds: "But we can not agree that the accused was under any greater obligation, when on his own premises, near his dwelling house, to retreat or run away from his assailant, than he would have been if attacked within his dwelling-house" The force of these and other authorities induces the conclusion that instruction number six was defective in the particular indicated, and was properly rejected.

But instruction number seven, I think good in form. It was intended to present defendant's rights as to retreating when attacked *in* his dwelling or castle, and to apply the law to the specific facts in the case. The question is then plainly presented by its rejection, whether there was evidence in the case entitling the prisoner to have the legal proposition covered or intended to be covered thereby submitted to the jury. Involved is the primary question whether the prisoner was in fact violently assaulted by the deceased *in* his dwelling or castle with intent to commit a known felony, justifying the homicide; and lastly, whether the defendant was without fault—did not himself by his own conduct bring about the conditions under which he has attempted to justify the killing of his assailant. The law seems to be that, if there is no other evidence except that of the prisoner himself, he is entitled to an instruction, stating all the elements thereof, on the law of self defense. Wharton on Hom. (3rd Ed.) 355, and note 8; *State* v. *Cushing,* (Wash.) 53 Am. St. Rep. 883; *People* v. *Lewis,* (Cal.) 59 Am. St. Rep. 167. On the several questions of fact involved, the evidence, so far as it seems necessary to detail it, shows that the prisoner and the deceased were both coal miners; that the house or shanty where the homicide occurred was owned by the coal company, and for some time before had been occupied by the prisoner and deceased and three others as their home or lodging and where they lived and did their cooking; that in the evening of the day of the homicide the prisoner and two other persons were engaged in the front room, in a game of cards, each of the players having small sums of money on the table, when the deceased came in and sat down to watch the game. A dispute having arisen between the players as to which of them the money belonged, the deceased interfered in opposition to the prisoner's contentions, and, in pro-

fane and vulgar language, declared that he did not intend to
allow the prisoner to rob the boy engaged in the game. Where-
upon the prisoner grew angry and threw the cards, belonging to
deceased, over into the corner of the room and walked out
through the kitchen and into the yard or road followed by de-
ceased. The witnesses do not exactly agree as to what was said
and done by the two as they passed out. The principal witness
for the State says, that Murphy was walking behind Crawford,
and, that when they had gotten into the kitchen Crawford turned
around, and that he heard him inquire of Murphy whether he
had drawn a gun on him, and to which Murphy replied: "No,
I don't need to draw a gun on you, I can break my fist over your
damn neck." The principal witness for defendant says, that as
they passed out Murphy said to Crawford: "By hell, I will
beat the God damned hell out of you;" and that Crawford re-
plied: "I will fight you with my fist,—I will break your God
damned neck;" that Crawford walked on out of the shanty and
turned around and walked back in saying to Murphy: "I will
kill you, you God damn black son of a bitch; will you draw a gun
on me;" and that to this Murphy made no reply. This witness
testified that he was with Murphy that evening, at the coal
company's store, a short time before the shooting, saw Murphy
have a gun, and that he said to him: "If any of them sagers or
niggers—any of them God damned niggers come over to his
shanty tonight and played bad, that he was going to paste some
of them with a cartridge." This witness also says that Craw-
ford was the first man that used the language that he would whip
Murphy with his fist. The defendant himself says that as he
went into the kitchen he asked Murphy whether he had drawn a
gun on him, and that Murphy answered: "I don't need no
gun for you, I can break your damned neck without a gun;" that
he inquired of him a second time: "Did you draw that gun on
me?" and that Murphy replied to him: "What are you going
to do about it?" and that he answered: "I am not going to do
nothing, I have taken you to be my friend," that Murphy, ap-
plying an epithet, too profane and vulgar for repetition, said:
"I will kill you;" and that as he said this Murphy was standing
in the door with his gun in his hand; that he, Crawford, jumped
behind the middle door to get his gun, and as he jumped back
Murphy was in the act of raising his gun, when he, Crawford,

shot him.  All the witnesses agree that after Crawford fired
Murphy called for a doctor, saying that he had been shot, and
started to run up the road followed by Crawford.  Two shots
were fired on the way, but the evidence is conflicting as to which
of the two fired them; Crawford denying that he fired the shots,
other witnesses testifying that he had admitted to them just
afterwards that he had fired them.    Defendant further says,
concerning the altercation in the kitchen, that on the way out
into the yard or road, Murphy, after drawing his gun on him,
put it back into his pocket, and did not at that instant attempt
to shoot him; that he does not know whether or not he attempted
to shoot him out in the yard, when he had his back turned, but
that when he went back into the house, Murphy, standing in
the door way, was drawing up his gun as if to shoot, when he
fired the fatal shot.  In addition to what has been said about
the occupancy of the house or shanty, Crawford says that it be-
longed to him and Bill Spoon, a colored man; that is, that he
and Spoon rented it of the company, and paid the rent; that
Murphy stayed there, but that he had told him to leave some
three or four times, because he would not clean up.

Enough of the evidence has now been detailed, I think, to
show the nature and character of the attack, the part each took
in it, how the house or shanty was held or occupied by defendant
and Murphy, and the applicability of the proposed instruction.
The evident purpose of this instruction, in connection with de-
fendant's general instructions given on the subject of self de-
fense, was to emphasize his right to stand his ground without
retreating, when attacked *in* his dwelling.   The evidence seems
to show clearly that the deceased went into the house with his
gun; was the first to begin the quarrel resulting in the shooting,
and it tends also in an appreciable degree to show that he was
first to draw his gun and attack the defendant in a place where
he certainly had the right to be, and from which place he was not
bound to retreat.  Of course, this house was, at least for the
time being, also the lodging or dwelling place of the deceased.
But, if the prisoner's testimony be true, he had the superior
right, and deceased had been notified by him to quit the prem-
ises.   What is the law applicable to these facts?   Mr. Wharton,
apparently on the authority of *Jones* v. *State,* 76 Ala. 8, says
on this subject:  "So a person in his own house has the same

right to stand his ground and kill in self defense when assaulted by a partner or co-tenant, as when assaulted by a stranger." Wharton on Hom. 492. The same principle is affirmed in *Naugher* v. *State*, 105 Ala. 26, and in *Haynes* v. *State*, 17 Ga. 465. In the latter case, a party, entitled to the joint use and occupancy thereof, had gone to a well to draw water for his family, where he was violently attacked, and where he killed his assailant; and it was held not necessary for him to have retreated to justify the killing. Indeed the more modern American doctrine seems to be that one without fault, when assailed in a place where he has the lawful right to be, whether that place be in his dwelling, or his premises, or in any other place, is not bound to retreat in order to save his own life, before taking that of his assailant, but may stand his ground, and repel force with force. Wharton on Homicide, (3rd Ed.) 469, sections 291, 473, section 295, and many cases cited in notes, including *Beard* v. *U. S. supra*, and our own case of *State* v. *Clark*, 51 W. Va. 457, overruling point one of the syllabus in *State* v. *Zeigler*, 40 W. Va. 593. If in his own house, there can be no question as to his right to be there. He has then in law retreated as far as he is bound to go. But *Commonwealth* v. *Johnson*, 213 Pa. St. 432, is relied on by the State. In that case the house in which defendant was assaulted was the property of the prisoner's wife, who was also deceased's mother, both members of her family. Neither had any rights to reject the other, and it was held that, in such cases, the ordinary rules of self defense are alone applicable, and that the right of a householder against a violent intruder do not apply. This case does not appear to have been very thoroughly considered; but I do not understand it to be in conflict with the modern doctrine of the American cases on the proposition covered, or intended to be covered by the instruction under consideration. The books certainly recognize a stronger right to maintain one's ground when attacked *in* his dwelling than when attacked on the outside. The latter phase was covered by prisoner's general instructions numbered 10 and 11, given. But was he not also entitled to have the fact that he was attacked in his dwelling house emphasized by the rejected instruction? I think he was. I express no opinion on the weight of the evidence as to the fact of the assault by the deceased; that is a question for the jury and not for the court.

I only say as a matter of law that there was sufficient evidence, showing, or tending to show, the assault by the deceased, to entitle the prisoner, if without fault, to the instruction; for if without fault he was entitled thereto. *Naugher* v. *State,* (Ala.) 17 So. R. 24. If in fault, either in provoking the assault, or in bringing about the conditions resulting in the homicide, he was not entitled to an instruction which ignored, as this instruction does, this element of self defense, for the authorities all hold that to justify homicide the slayer must have been reasonably without fault. *State* v. *Stockman,* (S. C.) 64 S. E. 595, Syl. point 19; Wharton on Hom. 358, section 223. All witnesses agree that deceased began the altercation, and defendant, and at least one of his witnesses concur in stating that deceased made the first assault, and no one pretends that defendant was the aggressor. It is suggested by the attorney general, that, by repeating his question to the deceased, as to whether he had drawn his gun on him, the prisoner was in fault, and thereby brought on or continued the difficulty culminating in the homicide, and that the instruction was properly rejected for ignoring this fact. But I do not think the evidence on this subject was of that appreciable character justifying the rejection of the instruction on this ground. Upon all points considered I think the court erred to the prejudice of the prisoner in rejecting instruction number seven.

It remains for us to consider instructions eight and nine, refused. Number eight would have said to the jury that, where one kills another, though intentionally, but in passion, in the heat of blood, upon sudden provocation by gross indignity, *or* by threat of personal violence, he cannot be found guilty of murder. Number nine would have told the jury that, although they might find from the evidence that defendant killed Murphy, and that the killing was intentional, yet if they should further find from all the evidence and circumstances in the case that such killing was done under the conditions assumed in the eighth instruction, he could not be found guilty of murder. Three objections were urged in argument against both these instructions: First, that if otherwise good, they are inconsistent with the theory of self defense, without evidence to justify them, and properly rejected on these grounds; second, that both ignore the element of malice, a distinguishing characteristic of murder; and,

third, that by the use of the disjunctive "or," preceding the words, "threat of personal violence," they would have justified the homicide on the ground of mere threat of personal violence. If there was no evidence of an appreciable degree showing or fairly tending to show, passion, heat of blood reasonably provoked, of course, they were properly rejected. Wharton on Hom. 356, section 222. If, however, there was sufficient evidence to support this theory of the defense, if otherwise good, they should have been given. State v. Matthews, (Mo.) 71 Am. St. R. 594, 601 and note; State v. Dickey, 48 W. Va. 325, (Syl. point 4); State v. Taylor, 57 W. Va. 228, 241; Wharton on Hom., sections 165 and 222 supra; 21 Cyc. 1076, and cases cited in note 85. The latter authority says: "But the state of the evidence may be such as to call for an instruction both on manslaughter and on self defense, and in that case the court should instruct the jury that if the defense is established it renders the killing excusable and defendant should be acquitted altogether."

Was there any evidence on which to predicate these instructions? Abusive language was used by the deceased toward the prisoner, and vile and opprobrious epithets applied to him; but as is said by high authority: "The nearly universal rule is that, when the evidence shows an intent on the part of defendant to kill, no words of reproach, no matter how grievous so ever, are provocation sufficient to free the party killing from the guilt of murder; nor are indecent, provoking actions and gestures, expressive of contempt or reproach, without an assault upon the person, especially when a deadly weapon is used in the killing." Wharton on Hom., 274, section 173, and many cases cited in note, including Allen v. U. S., 164 U. S. 492, 497; Read's Case, 22 Grat. 924, 938. On the subject of the reduction of murder to manslaughter Judge Moncure, in the latter case, says: "Words alone, however insulting, or contemptuous, are never a sufficient provocation to have that effect, at least where a deadly weapon is used, so tender is the law of human life, and so much opposed is it to the use of such a weapon." An exception has been ingrafted on this general rule in some decisions, and is recognized by Mr. Wharton, Wharton on Hom. 277, and perhaps by other authorities, applicable where "foul and opprobrious words are used in connection with vexatious acts and conduct, * * * * * if they are of such a character as to excite the passions of the

66 W. Va.

mass of men, so as to enthrall their reason; the question whether or not they are sufficient, being one of fact for the jury under all the circumstances of the case." Among the cases cited by Wharton, *State* v. *Grugin,* 147 Mo. 39, 71 Am. St. Rep. 553, 47 S. W. 1058, perhaps, most clearly states and applies this exception to the general rule; indeed, this case, by a divided court, attacks the general rule, and the theory on which it is based, and cites a number of cases in which the exception to the rule has been applied. "And this is the rule," says Wharton, "With reference to abusive language accompanied by an advance with a drawn knife." Citing as authority, *Gray* v. *State,* (Tex. Crim. App.) 83 S. W. 705; *Golden* v. *State,* 25 Ga. 527, and *Edwards* v. *State,* 53 Ga. 428, the latter case holding: "Mere words insufficient to reduce homicide from murder to manslaughter, though accompanied by the drawing of a knife, where no attempt was made to use it." In the case at bar there was no combat; a quarrel had ensued, but no blow was struck; but in connection with the words spoken by him, according to the defendant's evidence, deceased was in the act of raising his gun as if to shoot him when the fatal shot was fired. Do these facts and circumstances make a sufficient showing to entitle the prisoner to instructions on the theory of voluntary manslaughter? Our conclusion is that they do, and that they bring the case within the general rule, and certainly within the exception thereto contended for by the authorities cited. *Byrd* v. *Com.,* 89 Va. 536 (16 S. E. 727), was a case of homicide, committed under circumstances not unlike those in this case. In that case deceased, while applying abusive epithets towards defendants and others, seized a base ball bat, and raising it, approached defendant, threatening to mash out his brains. Later he took down the bat, and, according to some witnesses, rested on it, but, according to others, he held it swinging in his hand, but made no further attempt to inflict injury on defendant. The defendant ran back some distance, picked up a couple of rocks, and, turning, advanced two or three steps towards deceased, who had not followed him, and threw the rocks; the first hitting deceased on the head, resulting shortly afterwards in his death. This was held to be manslaughter, and not murder. "As a general rule," says Wharton, "it requires an assault or personal violence to constitute adequate provocation." But, as defined by this Court in *State* v.

*Hatfield,* 48 W. Va. 575 (37 S. E. 626), assault is an unlawful attempt or offer with force and violence to do bodily injury to another.   And as is said in the same case, and in the same connection: "An assault may be completed without touching the person of the one assaulted, as by lifting a cane, clinching the fist, or *pointing a gun* at him, but words alone, however abusive, cannot amount to an assault." That the killing of an assailant who is in the act of raising his gun to take the life of his slayer may amount to justifiable homicide, we do not think ought to deprive the slayer on trial for murder of the right to an instruction on the theory of manslaughter, if there be evidence of opprobrious words used, accompanied with an assault, as furnishing the requisite and necessary provocation.

But were these instructions bad for ignoring the element of malice?  Should they have contained the words, "without malice"?  In *State* v. *Dickey, supra,* and *State* v. *Dodds,* 54 W. Va. 289, instructions on the law of voluntary manslaughter were approved which did not contain these words of exception, limitation or condition.   It is said in the latter case, syllabus, point 2, that "The instructions given the jury must be taken together, and it is not necessary to insert in each separate instruction, all the exceptions, limitations, and conditions which are inserted in the instructions as a whole."   In the case in hand instruction number two for defendant, given, told the jury that "they must believe from the evidence, beyond every reasonable doubt, that such killing was done with malice aforethought, by defendant, and that such malice existed at the time of the beginning of the combat in which Murphy was shot by the defendant," and that unless they so found they could not "find the defendant guilty of murder."  Was this instruction, read in connection with instructions eight and nine, sufficient to limit the effect of those instructions to voluntary killing, "without malice"?   Mr. Wharton says, Wharton on Hom. 265, section 167:   "Where a homicide is suddenly committed in the heat of blood, or violent passion, on an adequate and sufficient provocation to produce in contemplation of law, the implication of malice is repelled and rebutted, and the killing is manslaughter, and not murder." And the same writer says, at page 314, apparently on the authority of *Metcalf* v. *Com.,* 27 Ky. L. Rep. 74 (86 S. W. 534), that, "Heat of passion necessarily includes 'Without previous malice' "

There was no evidence of previous malice; on the contrary, the evidence shows the previous friendship of defendant and deceased. The quarrel originated and ended suddenly, in a very brief space of time. Although, when the evidence calls for it, the element of malice should not be omitted from an instruction on manslaughter, yet on the evidence in this case, and in view of the other instructions given, we think the prisoner's instructions number eight and nine not defective so far as the question of malice is concerned.

And lastly as to the use of the disjunction "or." Both instructions assume that the adequate provocation necessary was produced by "gross indignity" *or* "threat of personal violence." They do not undertake to define to the jury the meaning of these words. The words "gross indignity" are more generally employed in proceedings for divorce, than in criminal cases, and when so employed, the indignity which will furnish good ground for divorce may be inflicted by acts or conduct rendering the condition of the injured party intolerable, and personal violence, or conduct creating fear of bodily harm, it seems, is not a necessary element of the offense. 14 Cyc. 625-6. But in the case of homicide, as we have seen, no words, however opprobrious, will, as a general rule, constitute sufficient provocation. Some assault or equivalent act of indignity must also be inflicted. What meaning, then, would these words of the instructions have conveyed to the jury, and to what evidence or facts proven in the case would the jury naturally and plainly have applied them? If it be said that they would have understood these words as applying to the abusive and vulgar language, and the assault by the deceased with his gun, the proper answer, we think, would be that having followed these words with the words, "or threat of personal violence," there was such a segregation of the fact of drawing the gun, the only act or threat of personal violence shown in the evidence and to which this language of the instructions could have applied, from the opprobrious language used, as would have confused the jury and rendered the instructions bad on this account. If the mere threat of personal violence by deceased, preceding his assault on defendant with his gun, as to which there was some evidence, was the threat to which the language of the instructions was intended to apply, the answer would be that mere threats, unaccompanied by other acts in-

ducing the reasonable belief that they are to be immediately carried into execution, and though attended with abusive and insulting language, will not, as a general rule, constitute adequate provocation. 21 Cyc. 743-4; Wharton on Hom. 402, section 243. At common law, voluntary manslaughter is the unlawful killing of another, without malice, on a sudden quarrel, or in the heat of passion. And generally, "if a man be greatly provoked by any gross indignity, and immediately kills his aggressor it is voluntary manslaughter, and not excusable homicide, not being *se defendendo.*" Wharton on Hom. 6, section 5. In every such case, however, the unlawful killing must have been done in the heat of passion, induced by adequate provocation; and though it may be done in general terms, the jury should be instructed as to what such adequate provocation is, and not left in doubt and uncertainty by the language of the general charge defining manslaughter, or by other language calculated to mislead. 21 Cyc. 1072; Wharton on Hom. 310, section 192. Measured by these rules we think instructions number eight and nine clearly defective, and that they were properly refused by the trial court.

I would reverse the judgment below for error in rejecting instruction number seven, but my associates having found no error therein, it must be affirmed.

*Affirmed.*

POFFENBARGER, JUDGE, *(concurring):*

The concrete case is not fully disclosed in the second point of the syllabus. The law, requiring retreat, applies only when the prisoner has provoked or induced the affray, in which the killing was done, or was otherwise in fault. A man in his own house need not retreat from any kind of an attack by an intruder, but he cannot there or elsewhere take life unnecessarily. In this case, the killing was not preceded by any combat, blow or blows struck, or anything more than a verbal altercation. The attack, if any, was violent, deadly and felonious. In such case, there is no duty to retreat, no matter where it occurs. Hence, the prisoner was fully protected by the instruction, embodying the law of self-defense and plainly telling the jury he was under no duty or obligation to retreat. In this state of the evidence, the place of the homicide was clearly immaterial, the law of the case being the same, whether it was in his dwelling house or elsewhere. It

is, I take it, elementary law that no party to a trial is entitled to have an instruction, raising an immaterial question. See numerous cases cited in 7 Ency. Dig. Va. & W. Va. 717, 718. Such instructions tend to confuse and mislead the jury.

In view of this, I do not see any necessity for determining the rights of co-occupants of a house when one, after mutual combat between them, takes the life of the other, or takes his life in resisting an attack not actually or apparently deadly or felonious. That element is not in this case.

Judges ROBINSON and WILLIAMS concurring in this note.

BRANNON, JUDGE:

I agree to the decision. I agree with Judge POFFENBARGER in regarding instructions 6 and 7 immaterial. But I wish to add that if this were not so, the refusal of them did not affect the trial. It is not the case of a bad instruction given, but of an instruction refused. Other instructions fully presented to the jury the defendant's right or defense of self defense, which the jury well knew without any instruction, even had not instructions fully presenting that matter to the jury been given. So, I am sure that there has been a fair trial, and that the want of those instructions did not affect it. I am opposed to the reversal of fair trials for high crimes on technical grounds. Such reversals bring odium and reproach upon the administration of the law and render life unsecure.

For this position I cited the cases in a note to *Lay* v. *Coal & C. Co.*, 64 W. Va., p. 296.